THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN SPIRES, Defendant-Appellant.

First District (3rd Division)   No. 1—85—3295

Opinion filed April 12, 1989.

---

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.

John Spires, of Menard, appellant *pro se.*

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Rimas F. Cernius, and Jeanne A. Morrow, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, John Spires, was convicted of the rape of four different victims and of violation of his bail bond. Defendant was found guilty but mentally ill and sentenced to 60 years on each individual rape, consecutively, and six years on the bail bond violation, concurrently. On appeal, defendant argues that (1) the statutes concerning the burden of proof of insanity and guilty but mentally ill were improperly applied in this case, thereby violating the *ex post facto* clauses of the State and Federal Constitutions (Ill. Const. 1970, art. I, §16, and U.S. Const., art. I, §9, respectively); (2) he was not proven guilty beyond a reasonable doubt to be legally sane; (3) he was denied effective assistance of counsel at trial; and (4) the trial court improperly imposed consecutive sentences on each of the four independent convictions of rape. We affirm.

Defendant was charged by four different indictments for offenses against four different female children. Defendant was charged with rape, aggravated kidnapping, indecent liberties with a child, armed violence and unlawful restraint of S.B.; the rape, aggravated kidnapping, indecent liberties with a child, unlawful restraint and kidnapping of D.R.; the rape, indecent liberties with a child and unlawful restraint of L.P.; and the rape, armed violence, unlawful restraint and attempted deviate sexual assault of G.P. Defendant was also charged with burglarizing the home of C.M. and jumping bail on all of the

foregoing charges.

At trial, three of the four victims testified. S.B. stated that on December 8, 1980, as she was walking home from school, she encountered defendant. S.B. was 12 years of age at the time. Defendant approached her and told her that he needed her help to rescue a cat that was trapped nearby. S.B. followed defendant as he led her into a basement. Defendant then displayed an object that S.B. thought was a weapon and told her that he would kill her if she did not cooperate. Defendant forced S.B. to remove her pants and underpants, lay on the basement floor and perform an act of sexual intercourse. When defendant departed, S.B. went to a friend's home for help and informed her friend that she had been raped. S.B. was taken to the hospital by the police. Offered by way of stipulation was evidence that S.B. suffered an abrasion and that there was fresh blood in her vaginal opening. Approximately 3½ months later, S.B. identified defendant in a lineup as the man who attacked and raped her.

D.R. testified that as she was walking to school on January 9, 1981, defendant drove up to her in a car, jumped out and grabbed her by the throat. D.R. was 14 years of age. Defendant forced her into the car and drove away to a secluded area. When defendant stopped the car, he told D.R. to take off her pants. When she refused, defendant punched her and threatened that she would be hurt if she did not comply. Defendant then proceeded to have sexual intercourse with D.R. When he was done, he released her from the car on the condition that she not say anything to anyone. D.R. ran from the car to a gas station and called her parents. Offered by way of stipulation was evidence that D.R. suffered contusions, scratches, bruises and vaginal discharge. D.R. identified defendant from photographs on March 30, 1981. She further identified defendant in a lineup as the person who attacked her.

L.P. testified that she was selling candy for her grammar school on September 24, 1980. L.P. was 13 years of age. When she approached the home of a neighbor she knew, the door opened and someone told her to come inside. Assuming the voice was that of her neighbor, L.P. entered the home. When she did so, defendant grabbed her by the throat and threatened to kill her if she did not comply. Defendant had forcibly entered the home of this neighbor through a basement window. After defendant took L.P. downstairs and raped L.P., he told her to go back upstairs. L.P. called her mother and ran from the house. On July 31, 1984, L.P. viewed a lineup wherein she identified defendant as her attacker. Offered by way of stipulation was evidence that she had a cut lip, bruises and vaginal bleeding.

Finally it was stipulated that if G.P. were to testify, she would state that on September 5, 1980, she was 12 years of age. On that day as she was walking with two of her friends, defendant drove up and exited his car. Defendant grabbed G.P. and put a screwdriver to her neck. Defendant forced G.P. into his car, drove away and attempted to rape her. G.P. fought defendant so he drove to another location and this time was successful in raping G.P. Defendant also attempted anal intercourse. Finally, defendant released G.P. from the car and drove away. G.P. ran to a nearby home and sought help. It was stipulated that G.P.'s lip was cut and that she sustained bruises and vaginal bleeding. G.P. viewed photographs as well as lineup wherein she identified defendant as the man who attacked her.

When defendant was stopped on a traffic offense and the police officer noticed a resemblance between defendant and a composite sketch at the station, defendant was detained for questioning. When defendant failed to appear for his court date, a bond forfeiture warrant was issued. A warrant was also issued for defendant for the rape of D.R. Defendant was ultimately located and extradited from Memphis, Tennessee.

Dr. Andrew Pundy testified on behalf of defendant. He stated that he examined defendant once in January of 1981 and again in January of 1985. In his opinion, defendant was, in the short term, both able to understand the criminality of his behavior and to conform his conduct to the requirements of the law. However, in the long term, defendant would ultimately act on his behavior. Dr. Pundy believed that defendant was a threat in the present and would continue to be one in the foreseeable future. Defendant had interviews with Dr. Pundy wherein Dr. Pundy concluded that defendant knew the difference between right and wrong and between what is lawful and unlawful. Dr. Pundy further testified that defendant related incidents where he aborted rape attempts because he felt the police were around.

Dr. Gerson Kaplan of the psychiatric institute of the circuit court of Cook County testified in rebuttal for the State. Dr. Kaplan stated that he interviewed defendant and they talked about all four alleged cases of rape. In Dr. Kaplan's opinion, there was a certain amount of purposeful planned behavior on defendant's part. He further stated that defendant was able to appreciate the criminality of his conduct during all four alleged rapes and was further able to conform his conduct to the requirements of the law on each occasion. Dr. Kaplan stated that defendant does suffer from a mental disorder. However, that disorder does not impair his thought, mood or behavior to the extent where his judgment would be rendered impaired. Finally, Dr.

Kaplan testified that he doubted if any form of treatment would decrease the obvious threat that defendant poses to society.

Following the close of evidence, the court found defendant guilty but mentally ill of the rapes of S.B., L.P., G.P. and D.R. He was also convicted of violation of bail bond. Defendant was sentenced to extended consecutive terms of 60 years for each rape and six years concurrently for violation of bail bond. This appeal followed.

Defendant first argues that the statutes concerning the burden of proof of insanity and guilty but mentally ill were improperly applied in his case. It is defendant's position that the trial court erroneously applied the amended guilty but mentally ill statute to his case thereby violating the *ex post facto* clauses of the State and Federal Constitutions. We disagree.

■ For a law to be applied *ex post facto*, the statute in question must apply to events occurring before its enactment and it must furthermore disadvantage the defendant affected by it. (*People v. DeWit* (1984), 123 Ill. App. 3d 723, 733, 463 N.E.2d 742, 749.) For a defendant to be disadvantaged by a statute, it must punish as a crime an act which was previously lawful, increase the penalty for a particular crime or deprive one charged with a crime of a defense that was available under the law at the time the act was committed. *People v. Smith* (1984), 124 Ill. App. 3d 805, 808-09, 465 N.E.2d 101, 104.

Prior to January 1, 1984, the insanity statute at issue required only that a defendant introduce evidence of insanity. Once a defendant put the insanity defense at issue, the State then was required to prove a defendant's sanity beyond a reasonable doubt. (Ill. Rev. Stat. 1983, ch. 38, par. 6—2(e).) However, the statute was amended and shifted the burden of proof to a defendant to prove by a preponderance of the evidence that he is not guilty by reason of insanity. Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e).

■ In the instant case, although defendant's trial was commenced after amendment of the insanity statute, his crimes were committed prior to the amendment. Contrary to defendant's arguments, the record does not support a finding that the trial court applied the amended statute to his case and shifted the burden of proof to him, thereby increasing to his detriment his burden of proof with regard to his insanity.

The record evinces that the presentation of evidence with regard to defendant's sanity proceeded under the old law, with defendant first raising the issue of insanity by the introduction of evidence to overcome the presumption of insanity and the State then presenting rebuttal testimony to prove that defendant was sane beyond a reason-

able doubt. At no point in the record does the trial court indicate that it applied the standard of the amended statute and not that of the old statute.

The court found that the State had sustained its burden of proving defendant sane beyond a reasonable doubt as required under the law in effect at the time defendant's offense were committed. Accordingly, we find that the court properly determined the issue of defendant's sanity and that no *ex post facto* violation exists requiring reversal of the trial court's decision. See *People v. Snowden* (1986), 147 Ill. App. 3d 763, 498 N.E.2d 612.

Defendant next argues that he was not proven guilty beyond a reasonable doubt to be legally sane. We disagree.

■ A person is not criminally responsible for his conduct if, at the time of such conduct, that person is incapable, because of a mental disease or defect, of appreciating the criminality of his conduct or is unable to conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).) A person who was not insane, but suffering from a mental illness when committing a criminal offense, is not relieved of criminal responsibility for the conduct. However, this person may be found guilty but mentally ill. Ill. Rev. Stat. 1985, ch. 38, par. 6—2(c).

■ The issue of a defendant's sanity is a question of fact. Thus, the decision of the trier of fact regarding whether a defendant was sane at the time an offense occurred will not be disturbed on review absent clear evidence that the decision is so palpably erroneous as to suggest a basis of prejudice or passion. *People v. Gindorf* (1987), 159 Ill. App. 3d 647, 657, 512 N.E.2d 770, 776.

■ The law in effect when defendant's offenses were committed required the State to prove that defendant was sane beyond a reasonable doubt when he committed the offense. We believe the record supports the trial court's determination that defendant was in fact sane beyond a reasonable doubt.

Dr. Pundy, the defense's expert witness, testified that defendant was able to understand the criminality of his behavior and that he was able to, in the immediate sense, conform his conduct to the requirement of the law. Dr. Pundy opined that although defendant was suffering from major depression, he did, in Pundy's opinion, know the difference between right and wrong and between what is unlawful and lawful.

Dr. Kaplan testified that defendant described his behavior and involvement in each and every one of the four rapes. Kaplan stated that on "all four occasions I felt there was a certain amount of purposeful

planned behavior." Dr. Kaplan further stated that although defendant was suffering from a mental disorder, it was not of the magnitude to impair his thought, mood or behavior to a level where his judgment would be substantially impaired. Kaplan concluded that at the time of the offenses, it was his unequivocal opinion that defendant was able to conform to the requirements of the law and was able to appreciate the criminality of his conduct. Thus, the trial court's finding is supported by the expert testimony.

Moreover, the trial court's determination is amply supported by the circumstances surrounding the offenses. The court of events surrounding each case demonstrates a pattern of deliberate and controlled actions belying the defense of insanity. Defendant planned each attack on the four victims and threatened to hurt them or kill them in his attempt to obtain compliance. In fact, defendant told his doctor that he had, on occasions, aborted planned rapes because he felt that the police were near and that he would be discovered. Furthermore, when defendant was due to appear in court on April 22, 1981, he fled the jurisdiction to avoid prosecution. In fact, defendant stated that, "[A]fter I got arrested on the case and made my bond I left the city." As this court stated in *People v. Snowden*:

> "[E]vidence of the ability to recall movements and words spoken, and evidence of an attempt to escape are all proper considerations in deciding whether a defendant could conform his conduct to the requirements of the law." (*Snowden*, 147 Ill. App. 3d at 771, 498 N.E.2d at 618.)

Accordingly, we find that the evidence supports the trial court's determination that the State proved beyond a reasonable doubt that defendant was sane.

Defendant next argues that he was denied effective assistance of counsel. It is defendant's position that trial counsel erroneously allowed the State to stipulate to testimony of the four victims as well as other witnesses. Therefore, according to defendant, he is entitled to a new trial or in the alternative to have his conviction reversed. We disagree.

■ Representation by counsel is considered constitutionally deficient if the incompetence produced substantial prejudice to the defendant without which the result would probably have been different. (*People v. Balfour* (1986), 148 Ill. App. 3d 215, 227, 498 N.E.2d 547, 557; see *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) Moreover, effective assistance of counsel refers to competent, not perfect, representation. Thus, the focus is on the totality of the circumstances rather than isolated instances during

the representation. *Balfour*, 148 Ill. App. 3d at 227, 498 N.E.2d at 557.

■ In the instant case, defense counsel, as opposed to having all of the four victims testify in person, stipulated to the testimony of two of them. Following the close of the State's case, defense counsel moved for a directed finding. When this motion was denied, defense counsel then stipulated to the testimony of other witnesses. Defense counsel thereafter presented Dr. Pundy to the court to introduce evidence of defendant's defense of insanity. Under these circumstances, we cannot find that defendant was deprived of effective assistance of counsel. It is not our role, as reviewing court, to sit in judgment on the strategy a trial attorney chooses to employ. The record is devoid of any evidence that defendant was prejudiced by the actions of defense counsel or that the results of the trial would have differed if defense counsel had chosen a different strategy. Therefore, we find that defendant was not denied effective assistance of counsel.

Finally, defendant argues that the trial court erred in sentencing him to 240 consecutive years in prison. It is defendant's position that the sentence violates the maximum aggregate of consecutive sentences authorized by section 5—8—4(c)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(c)(2)). However, the State argues that because defendant was charged under five separate indictments and convicted of four independent rapes of separate victims on separate occasions with each rape constituting a separate crime, the sentence is not violative of the statute.

■ The fundamental role of a court in construing a statute is to ascertain the intent of the legislature and effectuate it accordingly. To determine legislative intent, the court will examine the entire statutory provision and attempt to identify the statutory objective. (*City of Springfield v. Board of Election Commissioners* (1985), 105 Ill. 2d 336, 341, 473 N.E.2d 1313, 1315.) Furthermore, the court must choose a construction which gives the statute a clear and logical meaning rather than a meaning which renders it absurd, illogical, useless or unreasonable. *People v. Raseaitis* (1984), 126 Ill. App. 3d 600, 604, 467 N.E.2d 1098, 1102.

Section 5—8—4 states in part:

> "(a) *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event

the court may enter sentences to run consecutively. * * *

* * *

(c)(2) For sentences imposed under law in effect on or after February 1, 1978, the aggregate of consecutive sentences shall not exceed the sum of the maximum terms authorized under Section 5—8—2 for the 2 most serious felonies involved." Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—4(a), (c)(2).

■ It is our belief that defendant's reliance on section 5—8—4(c)(2) is misplaced. Section 5—8—4(c)(2) contemplates a situation where a defendant is charged with multiple offenses arising out of the same course of conduct and is sentenced concurrently on each separate offense. We do not believe, as defendant urges, that the legislature intended this section to be applied to instances where a defendant has, as in the case at bar, raped four different young people at four different and distinct points in time. The practical effect of accepting defendant's position would be to (1) give a defendant free reign to commit as many crimes as he desires with the knowledge that he is only subject to consecutive sentencing on two of those crimes and (2) lessen the protection of the public from persons who have been determined to be a serious threat to society because of their criminal conduct, thereby circumventing the purpose of consecutive sentencing. Such a conclusion is not supported by logic or statutory authority. Therefore, we hold that the trial court did not err in sentencing defendant to consecutive terms for the rapes of the four children.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

McNAMARA* and WHITE, JJ., concur.

---

*Justice McNamara participated in this opinion prior to his assignment to the sixth division.