THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAYMOND WITT, Defendant-Appellant.

First District (1st Division)   No. 1—89—0516

Opinion filed March 30, 1992.

Randolph N. Stone, Public Defender, of Chicago (Fred Weil, Alison Edwards, and Rita A. Fry, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Susan R. Schierl, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant, Raymond Witt, was found guilty of the murder of Zachary Pinquind and sentenced to a prison term of 40 years. On appeal, defendant contends that: (1) his conviction is invalid under the Illinois homicide law for first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) because the statute was not in effect at the time of the offense; (2) he was denied his constitutional right to a bench trial; (3) he was prejudiced by the prosecutor's comments regarding flight during opening and closing statements; (4) an instruction to the jury regarding circumstantial evidence was in error; and (5) the trial court erred in allowing certain cross-examination of defense witnesses. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. Wendell Cain testified on behalf of the State that on April 14, 1987, at 7:45 p.m., he went to Fuzzy's liquor store, located on the southeast corner of 45th Street and Cottage Grove Avenue, Chicago. Cain was standing at the counter talking, when a man named Glen entered the store and stated that Zachary Pinquind, a Fuzzy's employee, was involved in an argument outside. Cain went to the back door and looked out toward 45th Street. He saw Pinquind seated behind the wheel of his car, which was parked on the south side of the street, pointed east, and saw three men standing in the street talking to Pinquind. Another car was parked in front of Pinquind's car.

Cain heard one of the men say, "I will hurt someone about my money," in an angry tone, and another man say, "[H]ere come those white guys." Just then, Cain saw a police car heading down 45th Street toward Pinquind's car and Fuzzy's. The men around the car walked away.

Cain reentered the store via the front door. Richard Cain, Cain's brother and the store manager, entered the store and Cain told

Richard that Pinquind was arguing outside. Richard asked Cain to go and get Pinquind. Cain approached Pinquind's car and asked Pinquind to come into Fuzzy's. Pinquind did not accompany Cain into Fuzzy's. Richard sent Cain out a second time, and Pinquind said he was on his way. As Cain turned to go back into Fuzzy's, Pinquind was getting out of his car.

Pinquind walked into the store behind Cain. They both approached the counter, and Richard asked Pinquind what he was doing outside. Cain moved down the counter out of the range of the conversation, approximately 20 feet away.

At that point, defendant entered Fuzzy's and stood with his back toward the refrigerator at the front of the store. Defendant was watching Richard and Pinquind and he appeared to be angry. His arms were folded and he was moving his head from side to side. Cain stated that the store is brightly lit inside and that he was about the same distance from the refrigerator as from Richard and Pinquind.

After about five minutes, Pinquind left Fuzzy's and defendant followed him. Cain then left the store. Cain turned to walk east on 45th Street and saw defendant crouched down in front of Pinquind, holding a gun. Pinquind was standing against the wall of the store. Cain saw defendant fire the gun and saw the gun flame. Cain looked down into defendant's face and defendant looked up at Cain. Cain stated, "I know he saw me." Pinquind turned to pull away from the wall. Defendant arose from his crouched position and fired at Pinquind a second time. Pinquind jumped.

Cain then went back into the store and shouted to Richard, "someone just shot Zachary." Richard jumped over the counter and Cain said, "Richard, don't go out there, they are shooting." But Richard ran out and Glen ran behind him.

Cain waited a minute, then left the store. He saw Pinquind on the ground, trying to get up. Cain turned to go back into the store to get help and was stopped by a tall, dark man who was blocking the door. The man had one hand in his pocket and was waving his other arm. He said, "You punks better get away from here, don't nobody mess with anyone in our family." Cain backed off toward the other side of 45th and Cottage Grove. He heard police sirens and saw the police cars heading toward the scene. The man blocking the door ran toward the alley to the car parked in front of Pinquind's car. Cain pointed in the direction of the man who was running. He saw defendant run south down the alley. Cain stated that Cottage Grove is a big, well-lit street.

The police car turned east at 45th and Cottage Grove, in the direction of the running man. Cain saw the car that had been parked in front of Pinquind's car heading south down the alley, followed by the police car. Cain went back into the store and found out that an ambulance had been called.

Cain accompanied police officers to the hospital where Pinquind was transported and later to the police station. At the police station he viewed a lineup. He identified the man who stopped him from re-entering the store as Gregory Dixon. Cain did not see defendant in the lineup.

On the afternoon of April 29, Cain viewed police photographs and identified a picture of defendant as the man who had shot Pinquind. Cain signed the back of the photograph. On October 10, at approximately 1:30 a.m., Cain returned to the police station and identified defendant from a lineup.

Chicago police officer Mona Majeed testified on behalf of the State that on April 14, at 9:45 p.m., she investigated the scene of the shooting at 45th Street and Cottage Grove. She found Zachary Pinquind with a bullet wound in his stomach and interviewed Cain. Pinquind was lying with his head facing north and his feet pointed south.

Chicago police officer Guy Habiak testified that on April 14, he began an investigation of Pinquind's death. He interviewed Cain on April 14 and 29, and conducted the lineups in which Cain identified Dixon and defendant. On October 6, he and Detective Kutz left Chicago for Sacramento, California, to retrieve defendant, who was being held by California authorities pursuant to a Chicago arrest warrant. Habiak returned with defendant in custody on October 9. On cross-examination, Habiak stated that defendant had waived extradition from California. Chicago police detective David Kutz testified to the same essential facts as Habiak.

Cook County medical examiner Mitra Kalekar testified that she performed an autopsy on Pinquind on April 19. Kalekar found that Pinquind had a gunshot wound to his abdomen and she recovered a bullet from his spinal cord. She also found an incision on his right calf. Kalekar determined that Pinquind's death resulted from the gunshot wound to his abdomen.

Defendant presented alibi witnesses on his behalf. Tyrone Witt, defendant's brother, testified that he lived with defendant at 4730 South Ingleside, Chicago. On March 28, at approximately 9 p.m., he and defendant attended a birthday party for their brother, Claude Witt, at their sister Doris Armour's home at 10342 South Eberhart. At that time, defendant took some of his belongings with him to

Armour's home, but Tyrone did not know why defendant did so. Tyrone stated that his whole family was at the party, which lasted until 4 a.m. After the party, Tyrone went straight home, but defendant stayed at Armour's house. On Sunday morning, March 29, defendant left Chicago for Los Angeles, California. On cross-examination, Tyrone testified that he and defendant grew up together at 4742 South Ingleside, four to five blocks from Cottage Grove Avenue.

Doris Armour, defendant's sister, testified that on Saturday, March 28, she had a birthday party at her home for her brother Claude. She stated that she invited all of her brothers and sisters to the party. Defendant stayed at her home that night because he was going to leave for California the next morning. Armour stated that she had bought defendant his plane ticket to Los Angeles and gave him $300. On Sunday, March 29, Armour and her husband drove defendant to the Greyhound bus station and he caught a bus at around noon or 12:30.

On cross-examination, Armour testified that she did not know Gregory Dixon and that he did not attend the party. She did not make arrangements for defendant to go to California, she only bought the ticket.

Laura Galvez then gave alibi testimony on behalf of defendant. Galvez stated that she lives in Los Angeles, California, with her family. In April 1987, she was taking a computer terminal operator class in downtown Los Angeles at American Business Institute. She attended school every day for six months and received a certificate in 1988. Galvez first saw defendant on April 2 or 3 at the bus stop. They went to the beach together for a couple of hours and then she went home.

Galvez testified that she met defendant again the next day and saw him every week day thereafter during April 1987. On cross-examination, she stated that she never attended the American Business Institute in Chicago. She also stated that she does not recall anything from her computer course except the keyboard. The jury found defendant guilty of murder. Defendant's timely appeal followed.

Initially, defendant contends that the amended first degree murder statute was improperly applied in his case. Defendant argues that the indictment against him was void because first degree murder was not an offense at the time of the killing, and thus he was charged retroactively in violation of *ex post facto* laws. We disagree.

■ For a law to be applied *ex post facto*, the statute in question must apply to events occurring before its enactment *and* it must furthermore disadvantage the defendant affected by it. (*People v. Spires*

(1989), 182 Ill. App. 3d 176, 537 N.E.2d 1010.) For a defendant to be disadvantaged by a statute, it must punish as a crime an act which was previously lawful, increase the penalty for a particular crime or deprive one charged with a crime of a defense that was available under the law at the time the act was committed thereby making conviction easier. *People v. Shumpert* (1989), 126 Ill. 2d 344, 533 N.E.2d 1106; *Spires*, 182 Ill. App. 3d at 181.

Prior to July 1, 1987, the State had the burden to prove, beyond a reasonable doubt, the elements of murder. The defendant then had the opportunity to present evidence of a factor in mitigation, serious provocation or unreasonable belief, either of which must have been present to reduce an offense of murder to voluntary manslaughter. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a), (b).) However, the statute was amended defining the offenses of first and second degree murder, and shifting the burden of proof to a defendant, to prove by a preponderance of the evidence, one of the factors in mitigation to reduce an offense of first degree murder to second degree murder. Ill. Rev. Stat. 1987, ch. 38, par. 9—2.

In *People v. Shumpert* (1989), 126 Ill. 2d 344, 533 N.E.2d 1106, the Illinois Supreme Court determined that the amended homicide statute became effective on July 1, 1987. The court examined the language of section 13 of the act, which provided: "This amendatory act of 1986 shall only apply to Acts occurring on or after January 1, 1987, which cause the death of another," and determined that the language was not straightforward in providing an effective date. The court noted that the Governor did not certify the Act until January 5, 1987, and determined that although the Act was to be applied retroactively from January 1, 1987, such application of the statute violated the constitutional prohibition against *ex post facto* laws. The court reasoned that the statute would be *ex post facto* if applied retroactively because it altered the burden of proof for proving *second degree murder*, decreasing the degree of proof necessary to convict a defendant:

> "[T]he new Act not only requires the defendant to come forward with *some evidence* of a factor in mitigation; it requires the defendant to prove, *by a preponderance of the evidence*, a factor in mitigation. Furthermore, the State is no longer required to prove, beyond a reasonable doubt, the absence of the factor in mitigation. The Act is therefore *ex post facto* if retroactive." (Emphasis in original.) (126 Ill. 2d at 352.)

The court then explained its rationale:

"The cornerstone of the State and Federal constitutional prohibitions against *ex post facto* laws is that persons have a right to fair warning of the conduct which gives rise to criminal penalties, the degree of punishment and the legal rules of evidence. (*People v. Coleman* (1986), 111 Ill. 2d 87, 93[, 488 N.E.2d 1009].) Likewise, the cornerstone of the rules governing effective dates of laws is that persons have a right to fair warning of the contents of a bill so as to be given a sufficient opportunity to conform their conduct to the law. (*Mulligan v. Joliet Regional Port District* (1988), 123 Ill. 2d 303, 315[, 527 N.E.2d 1264].) The common purpose is to provide persons with *fair warning*. The Act, if applied retroactively, would violate the State and Federal constitutional prohibitions against *ex post facto* laws because persons indicted for homicide before the Act actually became effective would not have fair warning of the changes in the law." (Emphasis in original.) 126 Ill. 2d at 352-53.

■ Defendant's reliance on *Shumpert* is unavailing, as the three conditions determinative of *ex post facto* application of a law do not apply in this particular case. The record in the present case indicates that defendant's indictments of October 4, 1987, include the elements of murder as required under the old homicide statute. The indictments charge that on April 14, 1987, defendant:

"Committed the offense of first degree murder in that he, without lawful justification intentionally and knowingly shot and killed Zachary Pinquind with a handgun *** and

\* \* \*

He, without lawful justification shot and killed Zachary Pinquind with a handgun knowing that such shooting with a handgun created a strong probability of death or great bodily harm to Zachary Pinquind ***."

The trial court found that the elements of murder remained the same after the amendment of the homicide statute. Thus, the statute does not punish as a crime an act which was previously lawful.

The record further shows that defendant did not attempt to present an affirmative defense of self-defense or lawful justification to his charge of first degree murder in an attempt to reduce the charge to second degree murder. During pretrial discovery, the State, pursuant to Illinois Supreme Court Rule 413(d) (134 Ill. 2d R. 413(d)), requested that defendant give written notice of any defenses, affirmative or nonaffirmative, which the defendant intended to assert at any hearing or at trial. In his answer, defendant stated that he "may or

may not raise the defense of alibi" and supplied the date and location of the alibi. Defendant offered an alibi defense at trial and no other defense prior to or at trial. Thus, the degree of proof was unaltered in this case.

Finally, the jury found that the State had satisfied the elements of murder and proved the defendant guilty of murder beyond a reasonable doubt as required by the law in effect at the time of the offense. (See *People v. Snowden* (1986), 147 Ill. App. 3d 763, 769, 498 N.E.2d 612.) Contrary to defendant's arguments, the record does not support a finding that the amended homicide statute defined a new crime, increased the punishment for a previously committed offense or shifted the burden of proof to defendant, thereby detrimentally increasing his burden of proof with regard to murder. See *Spires*, 182 Ill. App. 3d at 181.

In the present case, defendant's indictments provided him with *fair warning* of the elements of murder, and defendant was afforded the opportunity to present his defense. Where the language of the indictment sufficiently informs a defendant of the charges against him, and defendant cannot demonstrate any prejudice resulting from an incorrect statutory citation, the defect is formal and does not warrant reversal. (*People v. McBrien* (1986), 144 Ill. App. 3d 489, 494 N.E.2d 732.) We find, therefore, that although technically the State cited the improper statute in its indictments, defendant was not prejudiced by the error, and thus the error was harmless. *People v. Ryan* (1987), 117 Ill. 2d 28, 37, 509 N.E.2d 1001; *People v. Weaver* (1968), 41 Ill. 2d 434, 437-38, 243 N.E.2d 245, *cert. denied* (1969), 395 U.S. 959, 23 L. Ed. 2d 746, 89 S. Ct. 2100.

Next, defendant contends that the State asserted its right to a jury trial after defendant requested a bench trial and that he was thus denied his constitutional right to a bench trial.

Every person accused of an offense has the right to a trial by jury unless that right is understandingly waived by the defendant in open court. (Ill. Rev. Stat. 1987, ch. 38, par. 103—6.) It is axiomatic that the waiver of the right to a trial by jury cannot be presumed from a silent record. *People v. Villareal* (1983), 114 Ill. App. 3d 389, 392, 449 N.E.2d 198.

Defendant argues that, prior to trial, he expressed his desire to be tried by the bench, that the State asserted its right to request a jury trial, and that the court indicated that it would respect the State's request for a jury "if asserted by the State." The record indicates that the State never asserted its request for a jury. The trial judge stated: "I will tell you in advance that my inclination is to grant the State's

right to a jury trial *** if they demand a jury trial." No further proceedings indicate a discussion of a jury or bench trial demand. The record indicates that on December 13, 1988, the following colloquy occurred:

"THE COURT: Okay. Ready for the jury trial?
THE DEFENSE: Yes, Judge.
THE COURT: Okay. Let's have the jury."

■ The record indicates that the issue of a jury versus bench trial was not raised by defendant again until post-trial arguments. At that time, defense counsel admitted that defendant agreed to a jury trial and that no effort was made on behalf of defendant to formally waive a jury. Thus, having not elected to waive trial by jury, defendant was not denied his constitutional right to a bench trial.

Defendant next contends that the prosecutor's comments during opening statement and closing argument regarding defendant's flight were improper because the State introduced no evidence at trial showing that defendant was guilty of flight or intentional concealment. In response, the State argues that defendant waived his right to appeal on this issue, as defense counsel failed to both object at trial and raise the issue with sufficient specificity in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-87, 522 N.E.2d 1124.) Even if the issue is not waived, we find that the comments were not improper.

A prosecutor is given great latitude in closing argument, and the propriety of his comments is within the trial court's discretion. (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 184, 484 N.E.2d 329.) It is well settled that the prosecution has the right to comment on the evidence that has been adduced at trial and make all legitimate inferences therefrom. (*People v. Wheatley* (1989), 183 Ill. App. 3d 590, 601, 539 N.E.2d 276.) Whether the People's argument exceeded the bounds of fair comment is to be determined from the totality of the circumstances surrounding the comment. (*People v. Jenkins* (1989), 190 Ill. App. 3d 115, 135-36, 545 N.E.2d 986.) It is well settled that improper prosecutorial remarks generally do not warrant reversal unless they are so prejudicial as to constitute such a material factor in defendant's conviction that the jury likely would have reached a contrary verdict had the remarks not been made. (*People v. Townsend* (1985), 136 Ill. App. 3d 385, 394, 483 N.E.2d 340.) Comments by the prosecution in rebuttal argument that are invited by defense counsel's closing argument are proper. (*People v. Perez* (1983), 113 Ill. App. 3d 143, 149, 446 N.E.2d 1229.) Moreover, a defendant is not denied a fair trial where the jury is admonished that the opening and closing

statements are not evidence. *People v. Thomas* (1990), 137 Ill. 2d 500, 530, 561 N.E.2d 57.

■ Defendant objects to various comments made by the prosecutor during her opening statement and closing argument that defendant fled to California after the shooting. In her opening statement, the prosecutor argued:

> "[T]he Defendant had actually left the City of Chicago and he left the State of Illinois and he had fled all the way to California."

In reliance on *People v. Harris* (1961), 23 Ill. 2d 270, 178 N.E.2d 291, and *United States v. Jackson* (7th Cir. 1978), 572 F. 2d 636, defendant contends that the prosecutor's arguments were based upon flight evidence that was not adduced at trial. Defendant's reliance is misplaced, as these cases do not stand for the proposition for which they are cited. In the present case, evidence of flight was not introduced at trial; rather, the prosecutor's comments are based upon the evidence adduced at trial that defendant was arrested in California, and that defendant presented an alibi defense that he was in California at the time of the shooting.

At trial, Wendell Cain testified that he saw defendant shoot Pinquind on April 14, 1987, in Chicago, Illinois. Cain testified "I know he saw me." Through alibi testimony, defendant attempted to establish that he went to California on March 29, 1987, and remained there throughout April 1987. Defendant intended for the jury to infer that he was not in the State of Illinois on the day Pinquind was shot. The State argued that from this same testimony the jury could infer that defendant fled to California because he knew that Cain could identify him.

Defendant also objects to a comment made by the prosecutor in closing argument:

> "Mr. Witt was probably at home before Zachary Pinquind ever got to the hospital."

The record indicates that Tyrone Witt and defendant lived four blocks from the scene of the shooting and that they grew up in the neighborhood. The jury could reasonably infer from the evidence that defendant ran from the scene of the crime to his nearby home.

Defendant further objects to the following comments made by the prosecutor in rebuttal closing argument:

> "The waiver of extradition, ladies and gentlemen, does not show anything about the defendant. The only thing it shows is that he knows the police now know that he is wanted for a warrant for murder in Illinois.

\* \* \*

The defendant did go to California, that's absolutely true, and the defendant went to California, we know he did, because that's where the police picked him up and brought him back to Illinois. The question is when did he go to California? When did he go to California: Ladies and gentlemen, you've heard the testimony of these witnesses about this birthday. How convenient. The end of March. Now we all remember it, right, and the next day we'll take him to the Greyhound Bus station. He didn't go the next day, ladies and gentlemen, He went when he got a feeling that the police were on his tail."

The record indicates that defense counsel argued in closing that the jury should infer from defendant's waiver of extradition that he was innocent of any wrongdoing:

"Now, if he was guilty, do you think he would have waived extradition? He could have. That was his right. They would have to prove, there are certain things that they have to prove before a person is extradited to another State. No, he didn't want that. He wanted his name cleared. \*\*\* Well, the fact that he waived extradition you can draw your inference. He didn't fight extradition. They're talking about flight now. A person, if you had fled from here, he is not going to waive extradition."

The prosecutor's comments were invited by the comments of defense counsel. Thus, the prosecutor's comments amount to fair comment on the evidence adduced at trial. In light of an eyewitness identification and the overwhelming evidence against defendant, any error by the prosecution in opening and closing statements was harmless.

Next, defendant argues that he was denied a fair trial because the trial court included a jury instruction regarding circumstantial evidence where only direct evidence was presented at trial. The State responds that defendant failed to properly preserve this issue for review and that it is therefore waived under *People v. Enoch*. Even if the issue were not waived, we find that there was circumstantial evidence in the present case and thus the jury was properly instructed.

Circumstantial evidence is the proof of certain facts and circumstances in a given case from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind. *People v. Rhodes* (1981), 85 Ill. 2d 241, 248-49, 422 N.E.2d 605.

■ Defendant argues that State's witnesses presented only direct evidence testimony without the necessity for inference or presumption. However, the record discloses numerous instances of circumstan-

tial evidence. For example, the record indicates that Wendell Cain saw defendant fire the first shot toward Pinquind's legs and the second shot as defendant was rising from his crouched position. The medical examiner testified that she found an incision on Pinquind's calf and a gunshot wound in Pinquind's abdomen. From this evidence, the jury could infer that these wounds were caused by the two shots fired by defendant.

Further, Cain testified that Pinquind was standing upright facing north and was in the process of turning away when defendant fired the second shot. Officer Majeed testified that Pinquind was discovered on his back with his head facing north. From this evidence, the jury could infer that the force of the second shot continued the momentum of Pinquind's turn and that his body landed in that direction. The record indicates that no weapons were discovered on the scene. The jury could thus infer that defendant carried the gun with him when he escaped from the scene. Because there was ample circumstantial evidence in the present case, the trial court correctly instructed the jury on circumstantial evidence.

Finally, defendant contends that the trial court permitted improper cross-examination of the defense witnesses thereby prejudicing his case. The State responds that defendant's objections are waived by defendant's failure to both object at trial and raise the alleged error in his motion for new trial. (*Enoch*, 122 Ill. 2d at 186.) We agree, but even so find that cross-examination of the witnesses was proper.

The scope of cross-examination is within the sound discretion of the trial court and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267.) While cross-examination is limited to the scope of direct examination, circumstances may develop on cross-examination that lie within the knowledge of the witness which explain, qualify, discredit or destroy his direct testimony, even though that material may not have been raised on direct examination. *People v. Franklin* (1990), 135 Ill. 2d 78, 97, 552 N.E.2d 743.

Defendant first argues that the prosecutor's question to Doris Armour, defendant's sister, regarding Gregory Dixon's presence at the birthday party she had at her house on March 28 tied Dixon to the defendant and attacked Armour's credibility. In reliance on *People v. Braggs* (1988), 184 Ill. App. 3d 756, 540 N.E.2d 767, defendant contends the question created improper insinuation allowing the jury to substitute presumption for proof because the State presumed facts

not in evidence as a precursor to impeachment of that witness, and then failed to introduce rebuttal evidence impeaching her testimony.

■ Defendant's reliance is misplaced because the the question was properly based on the evidence presented at trial. Wendell Cain testified that at the scene of the shooting Dixon blocked his entry to Fuzzy's and told him, "You punks better get away from here, don't nobody mess with anyone in our family." On direct examination, Armour testified that her immediate and extended family and her close friends attended the birthday party. The question was proper since Armour would know whether Dixon was a family member who attended the party.

Lastly, defendant argues that the prosecutor's line of questioning to Laura Galvez on cross-examination regarding where she attended business school and what she learned in a computer course constituted impeachment on an irrelevant and collateral matter. On cross-examination, the prosecutor asked Galvez if she ever attended the American Business Institute in Chicago, and Galvez responded that she did not. The prosecutor then asked her to describe the various parts of a computer learned in her course, and she stated that she learned the keyboard.

The cross-examiner is permitted to delve into the witness' story to test the witness' perceptions and memory. (*People v. Sandoval* (1990), 135 Ill. 2d 159, 174, 552 N.E.2d 726.) The partiality of a witness is subject to exploration at trial and is always relevant as discrediting the witness and affecting the weight of his testimony. (135 Ill. 2d at 174.) Generally any permissible kind of impeaching matter may be developed on cross-examination. (*People v. Collins*, 106 Ill. 2d at 269.) The purpose of impeaching evidence is to destroy the credibility of a witness. (*People v. Bradford* (1985), 106 Ill. 2d 492, 499, 478 N.E.2d 1341.) However, the cross-examiner may not impeach a witness on a collateral matter, which is a matter that can not be introduced for any purpose other than to contradict the witness. *Collins*, 106 Ill. 2d at 270.

Galvez testified that she spent every weekday during the month of April 1987 with defendant. When she met defendant and throughout the time she dated him, Galvez testified that she was attending a six-month computer terminal operator training course at the American Business Institute in Los Angeles, California. Galvez also testified that she visited her family in Chicago. Defendant contends that Galvez' response that she did not recall anything from the class except for the keyboard does not disprove that she dated the defendant while he was in California.

950

However, the prosecutor's line of questioning properly tested Galvez' memory, credibility, and her possible motive or bias regarding events that occurred during the period of time she allegedly spent with defendant in California. Moreover, defendant fails to cite authority showing how this line of questioning prejudiced his case. Therefore, the trial court properly allowed the prosecutor's questions on cross-examination.

For the aforementioned reasons, the judgment of the trial court is affirmed.

Affirmed.

BUCKLEY, P.J., and MANNING, J., concur.