THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES HORNE, Defendant-Appellant.

First District (2nd Division)   No. 1—91—2721

Opinion filed May 18, 1993.

Rita A. Fry, Public Defender, of Chicago (Kim L. Sorrells, Assistant
Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan
Schierl, and Leslie German, Assistant State's Attorneys, of counsel), for the
People.

JUSTICE SCARIANO delivered the opinion of the court:

On January 29, 1987, defendant, his mother Ruby Horne, his sis-
ter Vivian Jackson, and Vivian's daughter Tania Jackson were all liv-

ing together at 7449 South Ingleside in the City of Chicago. At approximately 2:30 a.m that morning, Vivian was awakened by her mother, who was complaining that defendant was pestering her to give him some cigarettes. Vivian told Ruby to go back to sleep and lock her bedroom door. About an hour and a half later, however, Vivian once again was awakened by her mother's beckoning. When she proceeded into Ruby's room to investigate, she saw Ruby lying on the floor with a stab wound in her back and defendant standing next to her with a butcher knife in his hand. Vivian asked defendant what had happened, but he said nothing and quickly left the room. Eventually, defendant dressed and left the house, telling Vivian that she should "take care of mama." In the meantime, Vivian had Tania call the police, who transported Ruby by ambulance to Bernard Mitchell Hospital, where she died later that morning from the stab wound.

After stabbing his mother, defendant walked to the home of Jack Brown, a neighbor and friend of the family. When defendant arrived, Brown was conversing on the telephone with defendant's brother, Douglas Horne, who informed him of the stabbing. When Brown asked defendant about what had happened, defendant did not respond to his questions. Brown later went to the hospital without defendant where he was prevailed upon by police officers to bring defendant to the hospital. Brown eventually coaxed defendant into accompanying him to the hospital.

At about 9:30 a.m., defendant was taken into custody at the hospital by Chicago police officers Armando Galan, Joseph Sfehlik and John McMurray. Officer Sfehlik read defendant his *Miranda* rights, and defendant responded "yes" when asked if he understood each right. Defendant was later transported to the 21st police district, where Officer McMurray asked him several follow-up questions in order to complete his arrest report. Defendant was also questioned after being read his *Miranda* rights by Detectives O'Leary and Redmond.

Defendant was then interviewed by Assistant State's Attorneys Lori Levin and David Cuomo, and after Levin advised defendant who she was and again read to him his *Miranda* rights, he indicated that he wanted to talk to her about his mother's death. Levin reduced defendant's statement to writing, read it back to him, and had defendant sign it and initial each page. In that statement, defendant related that he awoke in the middle of the night and wanted a cigarette. When he went to his mother's bedroom and obtained one, however, she told him that he smoked too much and took it away from him. While he was "fumin [*sic*]" with her, he asked her if he could at least smoke one half of a cigarette. At that point, Ruby yelled for

Vivian and threatened to call the police. Defendant stepped on the phone to prevent her from making the call, and while doing so, he noticed a knife on the floor. He then saw his mother reach for the knife, so he grabbed it away from her, but it somehow fell to the ground; Ruby fell on top of it and rolled around. Vivian then arrived, and defendant, without explaining how it got into his hand, took the knife in the kitchen, wiped it off, and placed it in the drawer where it belonged. He then left the house in order to "get his head together."

Defendant was indicted for two counts of murder and one count of armed violence, but on May 15, 1987, Matthew S. Marcos, M.D., a staff psychiatrist at the Psychiatric Institute of the circuit court of Cook County, determined that defendant was unfit to stand trial. Accordingly, he was placed in the custody of the Illinois Department of Mental Health and Developmental Disabilities. Subsequently, on August 27, 1987, and February 25, 1988, defendant was found to be fit for trial.

Defendant raised the defense of insanity, and the following evidence on that issue was adduced at trial. Vivian, who was called by the State, testified that defendant was hospitalized in 1987 for psychiatric problems which would often include altercations with their mother. She stated that defendant was supposed to take medication, and when he would do so, he remained quiet and generally stayed in his room; but because he did not think he was ill, defendant would often refuse to take his medicine. When that occurred, she testified, defendant would deteriorate and manifest the following symptoms: (1) he would consistently bother others in the house for cigarettes; (2) he would watch television intently even though it was not turned on; (3) he would collect water and his urine in bottles in preparation for a lawsuit charging the city with contaminating the water; and (4) he would bathe up to four times a day. Vivian related, however, that defendant was staying in his room and acting as if he were taking his medicine the week prior to the homicide, and her daughter Tania corroborated this statement.

Officer McMurray testified that when he interviewed defendant, he understood the questions, gave responsive answers thereto, was cooperative, and exhibited no unusual behavior.

After the State rested, defendant offered the expert testimony of Glenn Prentice, M.D., a psychiatrist in private practice who was retained by defendant to evaluate him on May 7, 1988. Dr. Prentice based his evaluation on interviews with defendant's family, the police reports related to this case, and defendant's mental health records regarding his previous hospitalizations; he did not, however, ask defend-

ant any detailed questions about the stabbing. He testified on direct examination that defendant had been suffering from schizophrenia, disorganized type, since at least December 1978, the date of his first hospitalization. Dr. Prentice opined that because of his illness, defendant was unable at the time of the homicide to conform his conduct to the requirements of the law, although he did admit that defendant knew it was wrong to murder someone. He based his opinion that defendant was insane at the time of the offense on his interview with defendant, defendant's history of severe mental illness which included assaultive behavior, his writing of religious letters full of obscenities around the time of the incident, and his relation of a story to his brother the day before the murder about selling a building for $25,000. Dr. Prentice conceded on cross-examination, however, that although defendant's actions subsequent to the crime did not necessarily mean that he was sane, defendant's wiping off of the knife and fleeing the scene of the crime were "goal-directed." He also testified that he was unaware that defendant was acting as if he were taking his medication the week prior to the homicide.

Defendant next called to the stand Warner Teteur, M.D., a forensic psychiatrist with extensive experience in evaluating persons charged with crimes, for both the State and the accused, in order to determine their sanity. Dr. Teteur examined defendant on October 7, 1987, and on April 17, 1990. In evaluating defendant, Dr. Teteur relied on those interviews, defendant's hospital records, the police reports, and his notes of interviews with defendant's family and friends. He opined that defendant had been suffering from schizophrenia, paranoid type—as opposed to disorganized type, a significantly more serious disorder—since at least December of 1978. He concluded that defendant was insane at the time of the offense because his illness prevented him from conforming his conduct to the requirements of the law. Dr. Teteur based his opinion primarily on defendant's lengthy history of serious illness, including assaultive behavior against his mother, as well as his recent delusion of grandeur regarding the sale of property. He did admit, however, that defendant's acts of wiping off the knife, fleeing from the scene, and offering an exculpatory story evidenced his ability to understand the criminality of his acts.

Defendant next presented the testimony of defendant's neighbor Jack Brown, who stated that defendant had a history of bizarre behavior, including the propensity to talk to himself and to abuse others verbally. Finally, defendant's brother related that defendant had told him the day before the murder that he had just sold a building for $25,000 and was looking for the check which constituted the proceeds

therefrom. He also stated that defendant told him on the telephone at Brown's house on the morning of the incident that the stabbing was an accident.

In rebuttal, the State called Michael Rabin, a senior staff psychologist for the Psychiatric Institute of the circuit court of Cook County who had testified extensively in previous criminal proceedings on behalf of both the State and defense. He examined defendant on May 7, 1987, and on September 20, 1988, and in evaluating defendant, he relied on those examinations, defendant's hospital records, the police reports, and the opinions of Dr. Prentice and Dr. Teteur. He opined that although defendant was suffering from a condition called "schizo-affective disorder," that illness did not prevent him from either appreciating the criminality of his conduct or from conforming his conduct to the requirements of the law. Dr. Rabin thought that defendant could understand the criminality of his acts because he washed the murder weapon, left the scene of the crime, and provided the police with an exculpatory story. He further opined that defendant was able to conform his conduct to the requirements of the law because he changed his story from the one he gave during the first interview, wherein he stated the stabbing was an accident, to that given in the second one, wherein he told Dr. Rabin that he was receiving fumes from the telephone which made him stab his mother, thus indicating to Dr. Rabin that defendant had fabricated the second story to coincide with his insanity defense. Dr. Rabin also felt that the "telephone fumes" explanation was an untruth because he made no mention of it to the arresting police officers.

Dr. Rabin also explained why he disagreed with the opinions of defendant's experts. First, he felt that Dr. Prentice's opinion was flawed because he failed to question defendant regarding the circumstances of the homicide. He also questioned Dr. Teteur's conclusion that defendant was insane for the reason that he provided no explanation as to how defendant's mental illness prevented him from conforming his conduct at the time of the offense to the law.

The State next presented the testimony of Albert Stipes, M.D., who was also on the staff of the Psychiatric Institute of the circuit court of Cook County and who had experience similar to that of Dr. Rabin. Dr. Stipes examined defendant on February 24, 1988, and September 20, 1988. In evaluating defendant, Dr. Stipes used those interviews, defendant's hospital records, his statement to the police, and Dr. Teteur's report. He opined that although defendant was suffering from schizophrenia, paranoid type, at the time of the incident, that illness did not prevent him from understanding the criminality of his

acts or from conforming his conduct to the requirements of the law. His reasons for these conclusions were identical to those of Dr. Rabin, *i.e.*, defendant's attempt to cover up the crime and his apparent fabrication of the "telephone fumes" story. He also concurred with Dr. Rabin's criticisms of defendant's experts, adding that Dr. Prentice's opinion was incredible because defendant certainly did not have schizophrenia, disorganized type.

Finally, the State presented the testimony of Assistant State's Attorney Cuomo, who stated that although defendant was a bit nervous during questioning by Assistant State's Attorney Levin, he was responsive and coherent throughout the session. Cuomo also related that he had a brief conversation with defendant, wherein the two discussed who should have been the starting quarterback (Mike Tomczak or Doug Flutie) for the Chicago Bears in their recent playoff loss to the Washington Redskins.

The trial court found defendant guilty but mentally ill (GBMI), and after denying defendant's post-trial motion and hearing argument in aggravation and mitigation, sentenced him to a term of 20 years in the custody of the Illinois Department of Corrections.

Defendant appeals the trial court's finding that he was GBMI, essentially arguing that the trial court erred when it rejected his expert witnesses' testimony that he was insane at the time of the offense.

■■ "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(a); *People v. Johnson* (1991), 146 Ill. 2d 109, 128, 585 N.E.2d 78, 86.) The burden is on the defendant to prove by a preponderance of the evidence that he is legally insane. Ill. Rev. Stat. 1987, ch. 38, par. 6—2(e); *Johnson*, 146 Ill. 2d at 128, 585 N.E.2d at 86.

■ Our legislature has also promulgated an alternative verdict of GBMI where a defendant has unsuccessfully raised the defense of insanity (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(c); *Johnson*, 146 Ill. 2d at 131, 585 N.E.2d at 88), and that statutory provision states that "[a] person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found [GBMI]." (Ill. Rev. Stat. 1987, ch. 38, par. 6—2(c).) Under the statute in existence at the time defendant committed the offense in question, the State, in order to obtain a GBMI verdict, was required to prove beyond a reasonable doubt that defendant: (1) was guilty of the offense charged;

(2) was mentally ill at the time of the commission of the offense; and (3) was not legally insane at the time of the commission of the offense. Ill. Rev. Stat. 1987, ch. 38, par. 115—3(c); *People v. Scott* (1992), 148 Ill. 2d 479, 534, 594 N.E.2d 217, 239.[1]

The issue of whether the trial court properly found that the State proved beyond a reasonable doubt that defendant was GBMI at the time of the offense is a question of fact; therefore, the fact finder's resolution of that issue will not be overturned unless it is contrary to the manifest weight of the evidence. (*Johnson*, 146 Ill. 2d at 128-29, 585 N.E.2d at 86; *People v. Gilyard* (1992), 237 Ill. App. 3d 8, 24, 602 N.E.2d 1335, 1346, *appeal denied* (1993), 148 Ill. 2d 647.) It is within the province of the trier of fact to evaluate the testimony of the psychiatric expert witnesses and to resolve any discrepancies therein. (*People v. Kluxdal* (1991), 225 Ill. App. 3d 217, 224, 586 N.E.2d 701, 707, *appeal denied* (1992), 144 Ill. 2d 639, 591 N.E.2d 27; *People v. Bradley* (1991), 220 Ill. App. 3d 890, 903, 581 N.E.2d 310, 319, *appeal denied* (1992), 143 Ill. 2d 641, 587 N.E.2d 1018.) Expert testimony is to be judged by the same rules of weight and credibility which are applied to evidence offered through other witnesses. (*People v. Wilbur* (1992), 226 Ill. App. 3d 733, 736, 589 N.E.2d 1143, 1145, *appeal denied* (1992), 145 Ill. 2d 643, 596 N.E.2d 636.) Moreover, the fact finder may disregard all expert testimony and rely solely on evidence presented by lay witnesses. *People v. Camden* (1991), 219 Ill. App. 3d 124, 134, 578 N.E.2d 1211, 1219, *appeal denied* (1992), 143 Ill. 2d 641, 587 N.E.2d 1018; *People v. Reed* (1991), 209 Ill. App. 3d 575, 583, 568 N.E.2d 334, 338.

■ In the case *sub judice*, we find that there was ample evidence to support the trial court's determination that the State established beyond a reasonable doubt that defendant was not insane at the time of the offense, thus entitling the prosecution to a GBMI finding. First, the trial court accepted the testimony of the State's doctors who opined that although defendant was mentally ill at the time of the homicide, that illness did not prevent him from appreciating the crimi-

---

[1]Because of the obvious inconsistency in the statutory scheme which required a defendant to establish by a preponderance of the evidence that he was insane at the time of the offense in order to be entitled to an insanity finding, while simultaneously requiring the State to prove beyond a reasonable doubt that defendant was not insane at the time of the offense before it can obtain a GBMI finding (see *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972), the General Assembly amended section 115—3 of the Code of Criminal Procedure of 1963, effective January 1, 1990, in order to alleviate altogether the State's burden of proof on the issue of insanity. Ill. Rev. Stat. 1991, ch. 38, par. 115—3(c)(3).

nality of his conduct or from conforming his conduct to the requirements of the law. The court's decision to believe the State's experts was incontestably reasonable, since they persuasively advanced reasons to demonstrate that defendant appreciated the criminality of his conduct as shown by his actions subsequent to the crime (see *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 34, 535 N.E.2d 1001, 1006 (covering up of crime after commission evidence of sanity); *People v. Spires* (1989), 182 Ill. App. 3d 176, 183, 537 N.E.2d 1010, 1014 (attempt to flee scene of the crime evidence of sanity)); and also since the State's doctors opined that defendant was able to conform his conduct to the parameters of the law because they felt that he fabricated his "telephone fumes" story in order to bolster his insanity defense. See *Kluxdal*, 225 Ill. App. 3d at 225, 586 N.E.2d at 707 (postoffense conduct which lays groundwork for insanity defense evidence of sanity).

Furthermore, the trial court made clear that it relied more heavily on the testimony of the lay witnesses who observed defendant. First, the court believed, based on the testimony of Vivian and Tania, that defendant was taking his medicine and thus controlling his illness during the week immediately prior to the homicide. (See *People v. Williams* (1990), 201 Ill. App. 3d 207, 220, 558 N.E.2d 1258, 1266 (absence of irrational conduct prior to the offense evidence of sanity).) The court was also persuaded by the testimony of the police officers and others, especially Assistant State's Attorney Cuomo, who not only observed defendant shortly after the incident and testified that he was acting rationally and coherently, but also had a discussion with defendant regarding the Chicago Bears quarterback controversy. See *Williams*, 201 Ill. App. 3d at 220, 558 N.E.2d at 1266 (coherence while conversing with police officers and others shortly after the incident evidence of sanity).

Accordingly, we affirm the trial court's determination that defendant was GBMI, the State having established beyond a reasonable doubt that defendant did have a mental illness, but was not legally insane at the time of the offense.

Affirmed.

McCORMICK, P.J., and HARTMAN, J., concur.