THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL L. GILYARD, Defendant-Appellant.

Second District   No. 2—90—1206

Opinion filed October 20, 1992.

G. Joseph Weller and Ingrid L. Moller, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Michael L. Gilyard, was indicted in the circuit court of Lake County on three counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), two counts of armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2)), one count of home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a)(2)), and one count of unlawful use of weapons by a felon (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1). Following a jury trial, the State dismissed two first degree murder counts and the two armed violence counts, and defendant was found guilty of felony murder and home invasion. The State dismissed the unlawful use of weapons charge, and defendant was sentenced to 60 years' imprisonment on the felony murder conviction.

Defendant raises the following issues on appeal: (1) whether he was proved guilty beyond a reasonable doubt of intending to cause harm to the victim; (2) whether he was denied the effective assistance of counsel because defense counsel failed to tender an instruction on criminal trespass to a residence as a lesser included offense of home invasion; (3) whether the jury's determination that he was sane at the time of the offense was against the manifest weight of the evidence; (4) whether his conviction of home invasion must be vacated because it is a lesser included offense of felony murder; and (5) whether the trial court abused its discretion in sentencing him to 60 years in prison.

The following facts were adduced at defendant's trial. Brenda Wakefield testified that she was at the apartment of the victim, Zeronda Gilyard, in the late afternoon of January 28, 1990. Also present was Michelle Gilyard, the five-year-old daughter of the victim and defendant. Defendant and the victim were married, but defendant had never lived at that apartment.

At about 7:20 p.m. on January 28, the telephone rang, and the victim and her daughter had a telephone conversation with defendant. Approximately 20 to 30 minutes after the victim hung up the telephone, Wakefield heard a loud banging on the outside of the apartment door. She, the victim and Michelle ran into the bedroom when the victim said the defendant was outside. Upon entering the bedroom, the victim gave the telephone to Wakefield and asked her to call the North Chicago police. Wakefield called and told the dispatcher what was going on at the apartment.

While on the telephone, Wakefield saw the victim leave the bedroom with a gun and about 30 seconds later heard two gunshots in the living room area. There was a "pause" between the shots, but Wakefield could not estimate its length. Michelle was, at the time, lying on the floor behind the bed. After the shots, while Wakefield was still on the telephone, the victim ran back into the bedroom, and defendant followed her in, grabbed both her arms and dragged her back into the kitchen and living room areas, which are connected. After that, it got quiet, and then the police arrived.

On cross-examination, Wakefield stated that when the victim and defendant entered the bedroom the gun had fallen to the bedroom floor during the struggle. She did not see what happened to the gun after defendant left the bedroom, nor did she see the gun, a knife or any weapon in defendant's hands. She did not see who fired the shots.

Delsina Jones, a police dispatcher for the City of North Chicago, testified that on January 28, 1990, at about 7:34 p.m., she received a telephone call on the emergency line regarding a shooting at 1645 Hervey in North Chicago. Officer Donald Thivierge of the North Chicago police department testified that at about 7:34 p.m. on January 28, 1990, he was dispatched to 1645 Hervey because of a reported shooting. Upon entering the apartment, he observed defendant, the victim, Ms. Wakefield and Michelle. He ordered defendant to crawl to the door, and defendant did so.

Officer Thivierge is also a trained evidence technician. He identified the gun seized from the apartment floor as a seven-shot .22 caliber handgun. It held seven cartridges, two of which were unfired. He also identified two knives found on the floor of the apartment, one of which had a broken blade, and a broken tip of a knife blade found on the living room couch.

Detective Gerald Pedrin, chief of the North Chicago detective bureau, testified that on January 29, 1990, he took a statement from defendant while defendant was in the hospital intensive care unit. Defendant was medicated but not sedated at the time he gave the

statement. Defendant was read and waived his *Miranda* rights prior to the statement.

According to Detective Pedrin, defendant stated that at about 1:30 p.m. on January 28 he called the victim's home wanting to talk to his daughter. His daughter was not home at that time, but she called him later during halftime of the Super Bowl game. During that conversation, defendant's daughter told him that the evening before she had observed a man "touching her mother and doing other things to her" on the couch. The victim got on the telephone and told defendant she did not have to talk to him and was not going to explain herself regarding the incident.

After hanging up the telephone, he thought about it and decided that it "was not going to happen again" and that he was "going to stop that." He then drove to the victim's apartment and waited outside for somebody to come out. After no one came out, he tried unsuccessfully to enter the front door and the side door but finally was able to kick in the front door.

Upon entering the living room, he observed the victim coming out of the bedroom with a gun in her hand. She fired a shot, striking him in the chest, and they struggled. He was able to get the gun from the victim, and she reached down and picked up a knife from the kitchen counter. She came at him and grabbed the gun, and it went off, striking him in the thigh.

According to defendant's statement, he and the victim struggled and fell to the floor. He kept squeezing the trigger in an effort to empty the gun in case the victim would get it. While they were on the floor, and as he twisted her arm around, the gun went off. The victim stopped struggling and let go of the gun. She walked towards the front door and collapsed.

Defendant crawled to the victim, observed that she had been shot in the jaw and checked for a pulse. He did not find a pulse and attempted to crawl back to the gun to shoot himself. He apparently blacked out, as the next thing he remembered was a police officer telling him to open the door. Defendant never mentioned having a knife at any time during the incident.

On cross-examination, Detective Pedrin admitted that defendant did not state that he was squeezing the trigger to get rid of all the bullets. Rather, defendant said that the "gun kept clicking" during the struggle. On redirect, he clarified that defendant did state that he pulled the trigger to get rid of the bullets but that he did not put defendant's exact words in his written report. Detective Pedrin also testified that defendant was crying and clenching his hands and teeth

when he gave his statement but that such conduct is not unusual under such circumstances. According to Detective Pedrin, defendant responded appropriately to questions and answered questions understandably.

Dr. Nancy Jones, deputy medical examiner for Cook County, performed the autopsy on the victim. She described the most significant injury to be a close-range gunshot wound to the victim's lower right jaw. The bullet struck the mandible and fractured, with one fragment travelling completely across her neck into the left mandible. The bullet did not strike any of the major organs in the neck, and the major blood vessels were left intact.

In addition to the gunshot wound, the victim suffered from multiple injuries, caused by a knife or razor, on her head, face, chest, right arm and back. She also had defense wounds on the palmar surface of her left ring and middle fingers. She had a blunt trauma injury on her forehead, several superficial abrasions on her body and a stab wound on her back.

Dr. Jones opined that the cause of death was the gunshot wound but that the multiple stab and incise wounds would have contributed to the death. She further opined that the stab and incise wounds occurred before the gunshot wound.

Following the denial of defendant's motion for a directed verdict, Dr. Timothy Ts'o, a psychiatrist, testified that he examined defendant on January 30, 1990, while he was at the hospital. Dr. Ts'o was called in solely to evaluate defendant's ability to be medically treated due to defendant's history of psychiatric illness. According to Dr. Ts'o, he examined defendant for about an hour and a half on January 30, and he detected no symptoms of psychosis. He saw him again on January 31, and again defendant displayed no signs or symptoms of psychosis. Defendant did report feeling depressed about the whereabouts of his daughter.

Dr. Ts'o saw defendant again on February 2, 1990, and at that time defendant reported psychiatric symptoms to him. Defendant reported seeing an "aura of visual shadows." He also told Dr. Ts'o that he had begun to hear voices. Defendant's description of the voices was vague, and Dr. Ts'o could not say that defendant was experiencing auditory hallucinations.

Dr. Ts'o prescribed Dilantan, an anti-seizure medication, Haldol, an antipsychotic drug, Sinequan, an antidepressant, and Cogentin, a medication to counteract the side effects of Haldol. Defendant seemed to improve after the medications were administered. Dr. Ts'o stated

that he had no suggestion or evidence that defendant was not truthful with him.

On cross-examination, Dr. Ts'o testified that he did not admit defendant to a psychiatric ward of the hospital. On February 6, 1990, Dr. Ts'o released defendant from his care, indicating in his report that defendant was not suffering from psychotic symptoms, had no cognitive dysfunction, and was cooperative.

Dr. Phillip Gillespie, who treated defendant in the emergency room on January 28, testified that defendant suffered from a gunshot wound to his chest, a deflated lung, low blood pressure and a rapid heart rate. According to certain records, defendant had "pin point" pupils which Dr. Gillespie explained could be caused by defendant's being in shock.

Ms. Patricia Turner, an emergency room nurse who treated defendant, testified that defendant was in shock when he arrived at the emergency room. During treatment, defendant was combative and made statements such as, "Leave me alone. Just let me die." Defendant also had some superficial lacerations on his upper torso. She opined that the lacerations, while not having been made by jewelry, could have been caused by fingernails or some type of sharp instrument. Defendant spoke understandably and never mentioned suffering from any hallucinations.

A stipulation was entered between the State and defendant which established that a qualitative drug screen was performed on defendant at the hospital on January 28, 1990. The drug screen showed that no alcohol or illicit drugs were present in defendant's system.

Mr. James Hansen testified that defendant resided in one of his rental properties beginning in October 1989. The first four or five days, defendant just lay around and rested on the floor. Defendant did painting, cleaning, and plumbing work for Hansen and did a good job. When defendant was not working he seemed real nervous and walked around a lot. He heard defendant talk to himself on one or two occasions. Hansen saw defendant on the day before the incident and asked him what was the matter. Defendant said he just wanted to be by himself.

On cross-examination, Hansen stated that defendant made his rental payments in a timely fashion and appropriate amount. He was a good worker and followed orders. Hansen entrusted him with the keys to other apartments.

Dr. Mark Moulthrop, a clinical psychologist, testified that he specializes in evaluating abnormal mental states through psychological testing. He examined defendant on May 16, 1990. Dr. Moulthrop was

asked by Dr. Teich, a psychiatrist, to determine whether defendant's head injury and seizure disorder were associated with impaired judgment, inability to reason, and impulsive behavior. He was also asked to ascertain, through psychological tests and his own evaluation, whether defendant suffered from psychological illness and if such illness played a role in the incident.

Dr. Moulthrop reviewed defendant's records, interviewed defendant, administered a series of neurophysical tests, and determined that defendant's head injury and seizure disorder were not associated with impaired judgment, impulsiveness, or inability to control himself. In Dr. Moulthrop's opinion, the head injury did not play a significant role in the offense.

As to the question of mental illness, Dr. Moulthrop interviewed defendant, reviewed records from previous psychiatric and drug abuse hospitalizations dating back to the early 1980s, and conducted several psychological tests. The first test was the "Brief Psychiatric Rating Scale," which measures psychiatric symptoms and how much defendant showed the symptoms when interviewed. That test showed that defendant had a variety of different psychiatric symptoms with the most prominent being auditory hallucinations of voices talking to him.

Dr. Moulthrop also administered a "DuBeck Depression Inventory," which is a questionnaire answered by defendant. This inventory indicated that defendant did not have a high degree of depression at the time.

He also gave defendant the "Minnesota Multiphasic Personality Inventory" (MMPI), which measures psychiatric symptoms. According to Dr. Moulthrop, the MMPI did not provide a very valid picture of defendant. It did indicate that defendant admitted to many things that bothered him which could have been the result of his faking on the test. Depression and anxiety are other reasons for admitting to a very large number of symptoms. It is usually not a reason that the person is actually experiencing a great number of psychotic symptoms. Moulthrop did use the MMPI results to rule out a personality disorder and a specific depression pattern. He did not put much reliance on the MMPI in diagnosing defendant because it indicated "over-admission or a high distress level profile."

Moulthrop also performed a "Holgman Ink Block Technique," which measures reasoning and logical thinking in language. The purpose of this test was to look for illogical thinking or abnormal reasoning, which is referred to as a formal thought disorder. A score above 20 is considered in the abnormal range. Defendant's score was 41.

Moulthrop interpreted this score to indicate a formal thought disorder, a psychotic symptom.

He added that it is very difficult to fake an abnormal score on this test. The pattern of scoring did not indicate defendant was attempting to exaggerate his responses on the test.

Dr. Moulthrop opined, based on the testing, the interviews and defendant's records, that defendant suffered from a chronic psychotic disorder, most likely schizophrenia, on the date of the incident. To reach this diagnosis for the date of the offense, he looked at defendant's previous pattern of abnormal behavior prior to the crimes, defendant's present abnormal behavior and defendant's response that he had such symptoms during the time of the event.

Dr. Moulthrop explained that to be diagnosed as schizophrenic a person must have two of three psychotic symptoms: hallucinations, delusions, and formal thought disorder. At the time of examination, defendant suffered from auditory hallucinations and a formal thought disorder. He also might have had a nihilistic delusion that his life had become totally meaningless and that he would die. He had also suffered from past delusions that someone was controlling him or out to kill him. Defendant also exhibited a deteriorating ability to function in the workplace and a pattern of impaired interpersonal relationships.

Dr. Moulthrop ruled out a depressive disorder as a diagnosis for defendant. He also excluded drug abuse because defendant had not used drugs while in jail or at the time of his examination and defendant still displayed psychotic symptoms.

Defendant also suffered from command hallucinations which told him to do certain things such as hurting himself. Defendant told him that after receiving the telephone call from his daughter on January 28, voices told him to go over to his wife's house and talk to her. Defendant did not say that the voices told him to hurt his wife. When asked whether defendant's mental illness substantially impaired his ability to conform his conduct to the law, Dr. Moulthrop opined that defendant's psychotic symptoms "impaired his judgment, increased his agitation, increased his emotionality, impaired his ability to size up the situation, to know what he was getting into, and in general reduced his capacity to handle a very complex and emotional situation." He opined that defendant was not faking his mental illness.

On cross-examination, Dr. Moulthrop testified that he believed defendant to be a very intelligent man. He could not say, however, whether defendant's ability to fake or malinger was better than that of most individuals. According to Dr. Moulthrop, defendant was not suffering from drug-induced psychosis. He also admitted that his diag-

nosis of defendant was "most likely" schizophrenia and that defendant's disorder might be "schizo-affective disorder," which has hallucinations similar to schizophrenia but is accompanied by aggression or mania. This latter possibility is also a chronic psychotic mental illness which would also impair one's judgment. At the time defendant was examined by Dr. Moulthrop, defendant understood the purpose of the examination, knew the time, date, month and year and seemed to understand the test directions.

On redirect examination, Dr. Moulthrop stated that he had no opinion whether defendant knew right from wrong on January 28, 1990. He opined that defendant's illness substantially impaired his ability to conform his conduct to the requirements of the law. Defendant's first psychotic symptom did not appear until his early 20s. The most frequent age range for a schizophrenic disorder to develop is between 18 and 25.

Dr. Jeffrey Teich, a board-certified psychiatrist and neurologist, testified that he met with defendant in May and July 1990 and also interviewed him by telephone in June 1990. Dr. Teich opined that defendant suffered from chronic schizophrenia and an alcohol and drug abuse problem on January 28, 1990. He further opined that on that date he lacked the substantial capacity to conform his conduct to the requirements of the law because of his mental illness.

Dr. Teich observed defendant's demeanor and appearance, discussed his personal history both prior to the incident and after, reviewed various hospital records dating back to 1975, and considered the test results from Dr. Moulthrop. Dr. Teich agreed with Dr. Moulthrop that defendant's prior head injury did not have any effect on him beyond the seizure disorder. He also concluded that defendant's drug and alcohol abuse had not caused defendant brain damage.

Dr. Teich described schizophrenia as likely an inherited disease that generally begins late in adolescence or early in adulthood. Although there may be preliminary symptoms around puberty, the primary positive symptoms are hallucinations, delusions, and disorganized thinking. There are also negative symptoms such as not enjoying life and not feeling a part of things. Also, schizophrenics are not very good at maintaining relationships with other people. He also explained that the symptoms of schizophrenia fluctuate from better to worse. Schizophrenics also very commonly attempt suicide, and defendant has made many suicide attempts.

As to drug abuse, Dr. Teich stated schizophrenics have the same rate of substance abuse as any other group in the population. According to Dr. Teich, drug and alcohol abuse can cause hallucinations and

delusions under certain circumstances. Withdrawal from alcohol can cause hallucinations and sometimes delusions. Cocaine intoxication can cause paranoid delusions and severe agitation while withdrawal causes depression. Chronic cocaine use over a period of years can cause brain damage. Opiates such as heroin and morphine never produce hallucinations or delusions. Lastly, hallucinogens such as LSD cause hallucinations and delusions but not during withdrawal. The chronic pattern of hallucinations and delusions experienced by defendant would not be due to defendant's drug and alcohol use. Additionally, defendant's symptoms have persisted even during times when defendant had no access to alcohol or drugs.

While one of the emergency room physicians reported defendant's pupils to be pinpoint, which might indicate opiate use, the paramedics at the scene reported his pupils to be normal. Other indications of psychosis between January 28, 1990, and February 2, 1990, included defendant's desire to be reunited with his wife even though he knew she was dead. According to Dr. Teich, defendant's pain and pain medication could have masked defendant's psychotic symptoms during that time.

Dr. Teich testified that defendant told him that prior to the incident voices told him he ought to give up and leave town. Defendant had discontinued taking any medication in November 1989. Defendant related that after the telephone call with his daughter he began hearing voices telling him to go to his wife's apartment. After arriving there, the voices told him "[d]on't give up. Keep trying. You've got to talk to her." While he and his wife struggled, either he or the voices told him not to hurt her. After she collapsed, the voices called him foul names and told him that he killed her.

Dr. Teich explained that defendant was compelled by the auditory hallucinations and was unable to think about whether breaking the door down was a crime or not. It was something he had to do so he could talk to his wife. Defendant was unable to make a judgment as to whether he was committing a crime when he broke the door down and was consequently unable to conform his conduct to the law.

As to defendant's possible faking, Dr. Teich stated that the type of hallucinations defendant experienced contemporaneously with the incident were consistent with his prior hallucinations. Second, defendant made no attempt to blame his conduct on his mental illness. Third, defendant made no effort to embellish his story. Each time he related it, it was consistent with the previous rendition. Fourth, defendant's symptoms have been present at times when he was drug and alcohol free. Lastly, Dr. Teich's examinations of defendant and re-

view of his psychological testing indicate he suffers from a mental illness.

On cross-examination, Dr. Teich testified that no matter how intelligent defendant is he could not fake the disorganized thinking measured by the ink blot test. As to the MMPI, Dr. Teich, due to his lack of expertise on psychological testing, declined to answer a question whether a person could fake the results.

In response to a prior diagnosis of defendant as being violent and having an antisocial personality, Dr. Teich stated he had no direct evidence of defendant's violence or of defendant having an antisocial personality. Dr. Teich also admitted that drug and alcohol abuse was an important aspect of his problems but did not preclude the fact he was suffering from chronic schizophrenia.

In rebuttal, Dr. Henry Lahmeyer, a board-certified psychiatrist, testified that he examined defendant, reviewed his hospital records, reviewed police reports, reviewed correspondence from defendant to his wife and reviewed the reports of Dr. Moulthrop and Dr. Teich. Based on this information, Dr. Lahmeyer opined that defendant was sane at the time of the incident.

Dr. Lahmeyer did not observe anything particularly abnormal about defendant during his four-hour examination other than depression regarding his wife and daughter. Defendant responded appropriately to questions and was oriented as to Dr. Lahmeyer and the purpose of the interview. According to Dr. Lahmeyer, defendant's big problem has been drug and alcohol abuse which at times produced psychotic symptoms and was accompanied by antisocial behavior. He also noted that during most of defendant's hospitalization the symptoms cleared up rather quickly once the drugs were gone from his system. He admitted there were times when the voices lasted a little longer. There is a clear-cut personality disorder and drug abuse problem reflected throughout defendant's records.

As to schizophrenia, Dr. Lahmeyer found no evidence of "loose association" typical of schizophrenia. He also reviewed the testing done by Dr. Moulthrop and concluded that the MMPI results demonstrated a classic pattern of "bad faking." Defendant's MMPI profile fit exactly with the profile of someone who has some idea about an illness and is answering the questions in an effort to demonstrate the illness.

According to Dr. Lahmeyer, defendant's interview with Dr. Teich on June 21, 1990, was entirely different from his previous interview. There were references to delusional material at the latter interview whereas there had been none of that on the earlier date. In fact, there was no mention anywhere in defendant's history of an evil sec-

ond personality named "Draylig" which defendant referred to on June 21. Defendant never mentioned "Draylig" to Dr. Lahmeyer and took responsibility for what happened during the incident. Dr. Lahmeyer opined that defendant was not having hallucinations based on defendant's letters to his wife containing no such references and the fact that Dr. Ts'o did not indicate any signs of psychosis in defendant right after the incident.

On cross-examination, Dr. Lahmeyer admitted that it is possible that defendant's MMPI could have all the scales elevated because defendant actually had all those symptoms but the probability is about 2%. Also, lots of stress could shift the profile upward but not to the degree in defendant's case. The fact that defendant did not receive his medication that day would not affect his MMPI profile. Long-term mental illness can also shift the profiles upward but not to the level here. A history of drug abuse will not affect the profile other than elevating the psychopathic deviant scale. Regarding the inkblot test, Dr. Lahmeyer agreed that defendant's test showed a formal thought disorder but explained that a formal thought disorder must be evaluated clinically as well to be a reliable indicator of schizophrenia.

When asked whether he had an opinion that defendant was under the influence of an opiate based on his having pinpoint pupils in the emergency room, Dr. Lahmeyer stated that it was possible that defendant was but that he did not think it was really an important point. He also conceded that psychotic symptoms are more apparent at some times than at others and that someone can suffer from hallucinations one day but not the next.

Prior to jury deliberations, the State nol-prossed two first degree murder counts and the two armed violence counts. The trial court denied defendant's motion for a directed verdict as to both the felony murder charge and the home invasion count. The jury returned guilty verdicts on the felony murder and home invasion counts.

At the sentencing hearing, defendant made several corrections in his presentence investigation report (PSI). He pointed out that his first burglary occurred in 1985 not 1986, that he has an ongoing relationship with his former wife and his son, that he did not use $700 worth of heroin per day, that he did not begin using illegal drugs in high school but in college, and that he is not presently the subject of an outstanding parole warrant. The court also agreed not to consider an incident wherein defendant allegedly took his daughter to Texas without his wife's permission and to disregard a reference to defendant's wife purchasing a gun and obtaining a divorce because she was afraid of him.

Other than the PSI, the State introduced several victim impact statements in aggravation. The only evidence admitted by defendant in mitigation, outside the PSI, was a social history prepared by defendant. The PSI states that defendant was convicted in 1985 of two separate burglaries and a charge of theft over $200. He was convicted in May 1987 of another robbery and sentenced to five years in prison. Defendant also served four years in Federal prison for the interstate transportation of a stolen vehicle. The report also indicates that defendant has a college degree from Stanford University but has not been employed since 1984. The report further states that defendant began using illicit drugs in his late teens to early twenties and has continued to do so.

In sentencing defendant to a 60-year term of imprisonment, the trial court noted that it considered all of the appropriate aggravating and mitigating factors and did not see any likelihood of rehabilitation. The court also pointed to defendant's failure to follow through with treatment every time he had it available. Finally, the court stated that, while defendant technically qualified for statutory life imprisonment, it was going to impose a substantially similar sentence by sentencing him to 60 years in prison. The court found the home invasion charge to be an included offense and did not impose a sentence thereon.

Defendant first contends that the State failed to prove that he intentionally caused injury to the victim and, therefore, failed to prove him guilty beyond a reasonable doubt of home invasion, the predicate offense for felony murder. Defendant submits two arguments in this regard. First, he maintains that the State was required to prove that he had the intent to cause the victim injury at the time he entered the residence. Second, he argues that, even if the State need only prove intent to do harm sometime after the entry, it did not do so in this case.

■ As to defendant's first argument, we believe it is well established that the offense of home invasion requires proof of two elements: (1) an unauthorized entry; and (2) the use or threat of force by the invader while armed with a deadly weapon or intentional injury by the invader upon the occupant. (*People v. Ellison* (1984), 123 Ill. App. 3d 615, 621; *People v. Robinson* (1980), 89 Ill. App. 3d 211, 214; see *People v. Snow* (1984), 124 Ill. App. 3d 955, 963.) We do not agree with defendant that *People v. Medreno* (1981), 99 Ill. App. 3d 449, holds that home invasion requires proof of an intent to inflict harm at the time of the entry. Rather, the issue in *Medreno* was whether the indictment was defective for failing to allege that the defendant acted

" 'without authority.' " (*Medreno*, 99 Ill. App. 3d at 454.) The court held that the words "without authority" are a fundamental element of the offense, and, thus, the indictment was defective for failing to include that language. (*Medreno*, 99 Ill. App. 3d at 455.) While the court noted that "[t]he recently enacted offense attempts to make criminal certain well-defined conduct: an unauthorized entry of a dwelling for the purpose of threatening or using force," we do not interpret such language as holding that a defendant must have the intent to harm at the time he enters the dwelling. Furthermore, the above-quoted language was unnecessary to the court's holding and as such constituted *dicta*. See *People v. Simpson* (1989), 178 Ill. App. 3d 1091, 1096.

Moreover, we do not interpret the above-quoted language as meaning that the unauthorized entry be accompanied by an intent to cause injury. Such an interpretation is inconsistent with the plain language of section 12—11, which requires that a person enter a dwelling without authority "*and* 1) [w]hile armed with a dangerous weapon uses force or threatens the imminent use of force upon any person *** or 2) [i]ntentionally causes any injury to any person." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, pars. 12—11(a)(1), (a)(2).) Section 12—11 clearly requires proof of the use or threatened use of force while armed with a deadly weapon or the intentional causing of injury separate and apart from proof of an unauthorized entry.

We turn then to defendant's second contention that there was insufficient evidence to prove beyond a reasonable doubt that he intentionally harmed the victim once he entered the apartment. A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Steidl* (1991), 142 Ill. 2d 204, 226.) It is not the function of the appellate court to retry a defendant when considering a challenge to the sufficiency of the evidence; rather, the determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. (*Steidl*, 142 Ill. 2d at 226.) The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Steidl*, 142 Ill. 2d at 226.

■ In the present case, the evidence established that there was a struggle between the victim and defendant and that the victim suffered a gunshot, a blunt trauma to the forehead, several abrasions, numerous lacerations, defense wounds on her fingers, and a stab

wound during the altercation. Additionally, one of the knives recovered at the scene had its tip broken. The nature and extent of the victim's injuries, coupled with the fact defendant kicked in the door, would clearly permit a rational trier of fact to conclude that defendant intentionally injured the victim. Because the evidence, viewed in a light most favorable to the prosecution, established the essential elements of home invasion, we will not disturb the jury's verdict as to home invasion or felony murder.

Defendant's next contention is that he was denied the effective assistance of counsel because his trial attorney failed to seek an instruction on the offense of criminal trespass to a residence as a lesser included offense to home invasion. When a defendant raises a claim of ineffective assistance of counsel he must overcome a strong presumption that the challenged action was one of sound trial strategy. (*People v. Williams* (1991), 147 Ill. 2d 173, 235.) In *People v. Palmer* (1989), 188 Ill. App. 3d 414, defendant was charged with aggravated criminal sexual assault and claimed ineffective assistance of counsel based on his trial counsel's failure to tender an instruction on criminal sexual assault as a lesser included offense. The appellate court held that the decision of whether to offer the lesser included instruction was one of trial strategy which had no bearing on the competency of counsel. (*Palmer*, 188 Ill. App. 3d at 428.) Thus, the court refused to reverse the trial court by second-guessing defense counsel's tactics. *Palmer*, 188 Ill. App. 3d at 428; see *People v. Webster* (1988), 175 Ill. App. 3d 119, 127-28; *People v. Chapman* (1981), 94 Ill. App. 3d 602, 608.

The decision of whether to tender a lesser included offense instruction is, as recognized in *Palmer*, uniquely one of trial strategy. Unlike the decision to offer other types of instructions, such as self-defense (see *People v. Jaffe* (1986), 145 Ill. App. 3d 840, 855) and compulsion (see *People v. Pegram* (1988), 124 Ill. 2d 166, 174), the determination of whether to submit a lesser included offense instruction is a calculated risk on the part of defense counsel based on his or her assessment of the evidence and the perceived likelihood the jury will convict the defendant, even on questionable evidence, rather than acquit altogether. If the instruction is given to a jury that would have chosen to acquit on the greater offense then counsel has effectively subjected his client to the risk of conviction on an uncharged offense when the client might otherwise have avoided any conviction. Alternatively, if he fails to request the instruction his client may be found guilty of the greater offense because the jury, in considering closely balanced evidence, believed it should find defendant guilty of a crime

under the circumstances. It is these types of strategic calculations which we will not second-guess.

*People v. Bell* (1987), 152 Ill. App. 3d 1007, cited by defendant, appears to be distinguishable because there, among other shortcomings, counsel failed to request a voluntary manslaughter instruction while asserting an arguably related theory of self-defense.

Furthermore, a defendant must show that the deficient performance is so prejudicial as to deny him a fair trial. (*Williams*, 147 Ill. 2d at 235.) The failure to demonstrate the prejudice of trial counsel's alleged deficiencies will in itself defeat the ineffectiveness claim. (*Williams*, 147 Ill. 2d at 236.) In this case, the failure to tender an instruction on criminal trespass to a residence did not unduly prejudice defendant as the evidence here pertaining to the home invasion charge was not so closely balanced that it was reasonably likely the jury would have opted to convict defendant of criminal trespass and acquit him of home invasion. Based on the evidence presented, defendant's best chance at acquittal rested with his insanity defense. Accordingly, assuming trial counsel erred in failing to tender the lesser included instruction, such error was not so prejudicial as to have denied defendant a fair trial.

The next issue raised by defendant is whether the jury's determination that defendant was not insane at the time of the offense was against the manifest weight of the evidence. Section 6—2 of the Criminal Code of 1961 defines insanity as follows:

> "§6—2. Insanity. (a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1989, ch. 38, par. 6—2(a).)

The defendant has the burden to prove by a preponderance of the evidence that he is legally insane. (*People v. Johnson* (1991), 146 Ill. 2d 109, 128.) The issue of a defendant's insanity is a question of fact, and the jury's resolution of that issue will not be overturned unless contrary to the manifest weight of the evidence. *Johnson*, 146 Ill. 2d at 128-29.

■ Without unnecessarily reiterating the details of their testimony, we note that Dr. Moulthrop opined that defendant was suffering from schizophrenia at the time of the offense. Dr. Teich testified that in his opinion defendant suffered from chronic schizophrenia and was unable to conform his conduct to the requirements of the law on the date of the offense. On the other hand, Dr. Lahmeyer's opinion

was that defendant's problems stemmed from drug and alcohol abuse and that he had an antisocial personality disorder. He also believed defendant was "faking bad" on the MMPI administered by Dr. Moulthrop.

A trier of fact may accept one expert's opinion over another so as to resolve contradictions. (*People v. Gindorf* (1987), 159 Ill. App. 3d 647, 657.) Here, Dr. Lahmeyer's opinion, if believed over that of defendant's experts, would support the jury's finding that defendant was sane at the time of the offense. Moreover, Dr. Lahmeyer's testimony that defendant was faking on the MMPI, if accepted by the jury, would certainly have created a significant doubt as to the reliability of the opinions rendered by defendant's experts, both of whom relied on the MMPI results to some degree in arriving at their opinions.

Additionally, the jury was free to consider the facts and circumstances of the incident, and reasonable inferences to be drawn therefrom, in evaluating the conflicting opinions of the expert witnesses. (*People v. Bouchard* (1989), 180 Ill. App. 3d 26, 34; *People v. Skorka* (1986), 147 Ill. App. 3d 976, 982-83.) The evidence indicates that defendant received a telephone call from his daughter, who told him that another man had been touching defendant's wife and "doing other things to her." In response to this information, defendant drove to his wife's apartment. After waiting outside awhile, he tried to enter the apartment through the front door and the side door but was unable to. He then kicked in the front door. After being shot, he struggled with his wife and pulled the trigger on the gun several times in an effort to empty it. His wife was shot and collapsed, and defendant crawled to her and checked for a pulse. When Officer Thivierge told defendant to crawl to the door, he complied. Additionally, there was no mention by defendant in his statement to Detective Pedrin that voices were commanding him to go to the victim's home and enter her apartment as he later told Drs. Moulthrop and Teich.

This evidence of defendant's actions surrounding the incident, considered in its totality, provided another basis for the jury to decide to accept Dr. Lahmeyer's expert opinion of defendant's sanity, notwithstanding the testimony of Dr. Moulthrop and Dr. Teich. Defendant's conduct appears to have been deliberate and responsive to the situation.

Defendant's next contention is that his conviction of home invasion must be vacated because it is a lesser included offense of felony murder. Our supreme court, in *People v. King* (1977), 66 Ill. 2d 551, 566, held that when more than one offense arises from a series of in-

cidental or closely related acts and the crimes are not by definition lesser included offenses, convictions with concurrent sentences can be entered. Prejudice as to multiple acts exists only when the defendant is convicted of more than one offense some of which are lesser included offenses by definition. (*King*, 66 Ill. 2d at 566.) Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, notwithstanding the interrelationship of those acts. (*King*, 66 Ill. 2d at 566.) "Act" is defined as "any overt or outward manifestation which will support a different offense." *King*, 66 Ill. 2d at 566.

Defendant here relies on *People v. Devine* (3d Dist. 1981), 98 Ill. App. 3d 914, and two later third district cases citing *Devine*, as support for his contention that the home invasion in this case was a lesser included offense of felony murder. In *Devine*, the court stated that "[i]n the case of felony murder the underlying felony is a lesser included offense because the felony, which in the case at bar was armed robbery, is established by proof of the same or less than all of the facts required to establish the offense of murder in the course of an armed robbery." (*Devine*, 98 Ill. App. 3d at 924.) The State argues that *Devine* is at odds with *People v. Green* (1975), 62 Ill. 2d 146, wherein the supreme court held that the underlying felony is not an included offense of felony murder. Several appellate court opinions from other districts have refused to follow the holding in *Devine* as being inconsistent with *Green*. (See *People v. Thomas* (5th Dist. 1991), 217 Ill. App. 3d 698, 707; *People v. Davis* (1st Dist. 1988), 173 Ill. App. 3d 300, 313-14; *People v. Plummer* (1st Dist. 1986), 151 Ill. App. 3d 94, 98.) While we need not reach the broader issue in this case of whether the underlying felony is or is not a lesser included offense of felony murder, we note that *Green* appears to be controlling on that question and the appellate court opinions so recognizing are persuasive concerning that issue.

■ Nevertheless, we believe this case can be resolved by following the principles set forth in *King*. In doing so, we emphasize that we are not reaching the question of whether *King* and *Green* are reconcilable. In this case, there was evidence that the victim and defendant struggled and that the victim suffered a series of injuries in addition to the fatal gunshot wound. The medical examiner testified that she had several lacerations, a blunt trauma to the forehead, and a stab wound. While any of these acts could have supported defendant's conviction of home invasion, only the gunshot wound was sufficient to support a felony murder conviction as that was the only act of defendant that caused the victim's death. Thus, there were multiple

acts which would have supported both a felony murder verdict (the gunshot) and home invasion (the lacerations, stab wound, or blunt trauma). Under *King*, these separate acts were sufficient to support multiple convictions and concurrent sentences notwithstanding the interrelationship of those acts. *King*, 66 Ill. 2d at 566.

That leads us to the State's request that this case be remanded to the trial court for the imposition of a sentence on the home invasion conviction. We have the authority to remand for the imposition of sentence on a conviction where a defendant has appealed from that conviction. (*People v. Dixon* (1982), 91 Ill. 2d 346, 352-53.) In doing so here, we are careful to note, without expressing any preference, that it is within the discretion of the trial court to impose a consecutive or concurrent sentence. *King* states that the trial court " 'shall not impose consecutive sentences for offenses which are committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective.' " (*King*, 66 Ill. 2d at 565, quoting Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4(a).) Section 5—8—4(a) has been amended subsequent to *King*, however, and now provides that a court may impose a consecutive sentence under the circumstances formerly prohibited by section 5—8—4(a) where one of the offenses of which the defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily harm. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a).) Accordingly, the trial court should consider section 5—8—4(a) in deciding what appropriate sentence to impose under the facts of this case.

■ Defendant's final contention is that the trial court abused its discretion in sentencing him to a 60-year term of imprisonment. The determination of the appropriate sentence to impose in a case is a matter within the sound discretion of the trial judge, and his decision will not be overturned absent an abuse of that discretion. (*People v. Wilson* (1991), 143 Ill. 2d 236, 250.) In this case, the trial court expressly noted that it considered all appropriate aggravating and mitigating factors and did not see any likelihood of defendant's rehabilitation. The court also referred to defendant's history of failing to follow through with various treatment programs made available to him.

The evidence also established a long history of drug and alcohol abuse. Defendant has a past record of criminal conduct, although it seems to be limited to a short period of time several years ago. Several victim impact statements were also considered. Additionally, the victim's death arose in a violent confrontation with defendant while defendant's and the victim's daughter was present in an adjoining room. Under these circumstances, we hold that the trial judge prop-

erly exercised his discretion in sentencing defendant to the maximum nonextended term of imprisonment. In reaching this conclusion, we note that the trial judge refrained from imposing a life sentence. While he suggested that 60 years was in this case comparable to a life term, such a sentence does provide some opportunity for defendant to return to society after the completion of his sentence.

For the foregoing reasons, we affirm the judgment of the circuit court of Lake County. Further, we remand the cause to the circuit court for the imposition of a sentence on the home invasion conviction.

Affirmed and remanded with directions.

WOODWARD and GEIGER, JJ., concur.