(No. 73451

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EVAN GRIFFITH, Appellant.

*Opinion filed April 21, 1994.—Rehearing denied May 27, 1994.*

MILLER, J., specially concurring.
FREEMAN, J., joined by HARRISON and NICKELS, JJ., dissenting.

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen, Marcia L. Friedl and Martha E. Gillis, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the judgment of the court:

Following a jury trial in the circuit court of Livingston County, defendant, Evan Griffith, a prison inmate, was convicted of first degree murder and unlawful possession of a weapon by a person in the custody of the Illinois Department of Corrections. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), 24—1.1(b).) He was sentenced to death on the murder conviction and to a consecutive 30-year prison term on the weapon conviction. The death sentence has been stayed (134 Ill. 2d R. 609(a)), and the case is now before us on direct appeal (Ill. Const. 1970, art. VI, § 4(b); Ill. Rev. Stat. 1989, ch. 38, par. 9—1(i); 134 Ill. 2d R. 603).

## State's Evidence

The State's evidence at trial was essentially as follows. Defendant and the victim, James Jones, also known as Joseph Moore, and Wilford Mackey were all inmates at the Pontiac Correctional Center in Pontiac, Illinois. Additionally, they were all members of the Black Gangster Disciples street gang. Jones was the Institutional Coordinator (I.C.) of the Black Gangster Disciples within the Pontiac Correctional Center. The I.C. is the leader of a street gang within a prison. The defendant, Evan Griffith, served as Jones' personal secretary and "bodyguard." Due to his position within the gang, he was required by the gang to carry a weapon.

On the morning of October 2, 1990, Jones, Griffith and Mackey were in the prison's south yard. At approximately 11 a.m., Jones was talking on a telephone at a bank of telephones in the yard. While he was on the telephone, Mackey approached him from behind and repeatedly struck him on the head with a metal rod or pipe. Jones dropped the telephone and, unarmed, attempted to defend himself. Griffith then stabbed Jones once in the chest with a "shank." Jones fled but soon collapsed and died. The stab wound was the cause of death.

## Defendant's Evidence

The defense theory was self-defense. Defendant claimed that on the night before the stabbing, he received a message that Jones wanted to see him. Defendant sent word that he could not meet with him that night, but would see him the next day. Jones apparently became upset with defendant when he failed to come when summoned. On the following day, defendant attempted to clear things up with Jones. Defendant claims that he tapped Jones on the shoulder while he was on the telephone. Jones angrily ordered defendant to leave him alone and, a few seconds later, produced a shank.

Defendant then produced a shank and took two steps

back. Jones dropped the telephone and stepped towards defendant, bobbing and weaving. At the same time, defendant was jabbing his shank towards Jones to repel him. Jones quickly ducked down. When he came up, defendant's shank penetrated his chest. Both Jones and defendant dropped their knives. Defendant did not intend either to stab or to kill Jones.

### The Verdict

At the close of the trial, the jury convicted defendant of first degree murder and unlawful possession of a weapon by a person in the custody of the Department of Corrections.

Defendant waived a sentencing jury. In the first phase of the sentencing hearing, the trial judge concluded that defendant was eligible for the death penalty because the victim was a prison inmate killed on prison grounds.

During the second phase of the sentencing hearing, the State presented evidence in aggravation and defendant presented evidence in mitigation. The trial judge found that death was an appropriate sentence for defendant and that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, he sentenced defendant to death on the first degree murder conviction and to a consecutive 30-year prison term on the inmate weapon possession conviction.

Defendant appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

### DISCUSSION

On appeal, defendant claims numerous errors, all without merit. He further claims that the Illinois death penalty statute is unconstitutional. We affirm.

While we will address defendant's contentions on the merits, most of the issues have been waived since either no objection was made at trial or the issues were not properly preserved in a post-trial motion. As to several of the alleged errors, neither an objection nor a

post-trial motion was made. *People v. Enoch* (1988), 122 Ill. 2d 176.

Defendant alleges error since the State insinuated that defendant had a gang-related motive for committing the murder. The evidence brought forth by the State and the defense established that Jones held the position of "institutional coordinator" in the Black Gangster Disciples. While cross-examining defense witness Kevin Walton, who is also an inmate at the Pontiac Correctional Center and a member of the Black Gangster Disciples, the following discussion took place:

> "[PROSECUTOR]: After James died, was a new I.C. selected?
>
> [WITNESS]: No.
>
> [PROSECUTOR]: They never replaced James as the institutional chief?
>
> [WITNESS]: Not in '90.
>
> [PROSECUTOR]: Who is the I.C. now?
>
> [WITNESS]: I don't know.
>
> &#42; &#42; &#42;
>
> [PROSECUTOR]: Did you know an inmate by the name of Mackey?
>
> [WITNESS]: Yes.
>
> &#42; &#42; &#42;
>
> [PROSECUTOR]: Is he a friend of yours?
>
> [WITNESS]: I wouldn't say that. I said I knew him."

Defendant contends that based upon this line of questioning, the jury, without supporting evidence, was led to believe that the defendant killed Jones so Mackey could take over as I.C. of the Black Gangster Disciples. This argument is without merit. Mackey and defendant were both implicated in Jones' death. Merely asking Walton who the current I.C. is, and asking him whether he knew Mackey, does not improperly insinuate to the jury that Mackey sought to benefit from Jones' death.

Defendant was asked on cross-examination to give the name of the gang official who was above Jones in the Black Gangster Disciples' organizational structure.

Defendant refused to answer the question. By looking at sidebar discussions which took place outside the presence of the jury, defendant points out that the State thought that defendant may have been ordered to kill Jones. Thus, defendant argues that he was prejudiced in front of the jury since these allegations were never substantiated. However, the State did not pursue this line of questioning in the presence of the jury. Once the defendant refused to answer who was in charge of the gang, this line of questioning ended and no improper insinuations were made to the jury. The defendant cannot base a claim of prejudice upon statements which were made outside of the jury's presence.

Defendant's next contention of error is that the prosecutor, in closing argument, improperly suggested that the defendant had threatened and intimidated two witnesses for the State. Witnesses Marzette and Cleveland, both inmates at Pontiac Correctional Center, upon initially being interviewed about the attack upon Jones denied knowing anything. On the next day, they admitted that defendant was one of the attackers. Both Marzette and Cleveland testified that the reason they initially denied seeing anything was because there is a "code of silence" in prison. They described the "code of silence" as when one organization (gang) does something, then regardless of whether or not you are in that organization, you do not talk about what happened. In closing argument, the prosecutor reminded the jury that while Marzette and Cleveland initially denied having any knowledge about the attack on Jones, they both stated the reason for their denial was the "code of silence." The prosecutor added that Marzette and Cleveland had to face being confined in the same cell house with the same individuals who were responsible for the attack. Defendant contends that these comments conveyed to the jury that the witnesses had been

threatened by him. Contrary to defendant's assertions, the prosecutor did not suggest that the defendant had threatened the witnesses. Rather, he merely reminded the jury of the "code of silence" which they had already heard about.

Defendant also claims that the prosecutor improperly elicited testimony from Marzette and Cleveland that they had been threatened by fellow inmates due to their involvement in this case. Inmates Marzette and Cleveland both testified on direct examination that after they identified the defendant, they were moved out of Pontiac and into other prisons. Additionally, they both stated that due to their involvement in this case they had been threatened by other inmates in their new locations. Defendant contends that this testimony was prejudicial and improper since the jury was led to believe that the threats emanated from him. Contrary to defendant's assertions, the prosecutor made no references of this type. Rather, the threats which were made upon Marzette and Cleveland illustrated to the jury that the "code of silence" is an actual code of conduct within prisons. Since the jury was aware of the "code of silence," this testimony was not unduly prejudicial to the defendant.

Defendant further alleges that the prosecutor improperly elicited victim impact testimony from the victim's wife. Defendant points out that Innie Jones, the widow of James Jones, testified that she and Jones had been married for 18 years, they had three children and that the children and the victim loved each other. Defendant also relies upon the fact that in closing argument, the prosecutor told the jurors that they did not have to like the victim, but he was a human being, a son, a father, and a husband, and that no one has the right to take somebody's life for no legal reason. Defendant was not prejudiced by these comments. Mere

mention of family relationships does not necessarily result in prejudicial error. From Innie Jones' testimony, defendant takes three questions out of context and claims that the prosecutor intentionally elicited this testimony with the purpose of inflaming the jury. This is not the case. The prosecutor was merely establishing a foundation for Innie Jones' testimony. Additionally, after the prosecutor asked about the victim's relationship with his children, the trial judge stopped the questioning in regard to family relationships. After this, no more mention was made to the jury concerning the victim's family. Defendant failed to object to any of the questions at trial and has now failed to show that the prosecutor was intentionally attempting to inflame the jury. This court has recognized a distinction between making a jury aware of the family left behind and cases where the prosecution has dwelled upon the victim's family to the point that the jury could have related that evidence to the defendant's guilt. *People v. Lear* (1991), 143 Ill. 2d 138, 150; *People v. Del Vecchio* (1989), 129 Ill. 2d 265, 288.

## JURY INSTRUCTIONS

At the close of the evidence, the trial judge held a jury instruction conference. Present were the defense counsel, the defendant himself, and the prosecutor. During the jury instruction conference, the following colloquy occurred:

"[THE COURT]: [A]nd I wish to at this time, before launching into definitions or issues in a murder case, advise Mr. Griffith of the following: His attorney may request, but it's a decision that only defendant can make, as to whether the Court should give instruction to the jury on what in Illinois is called second degree murder.

In Illinois, a first degree murder is defined when a person kills an individual if, in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual or another; or he knows that such acts will cause death to that individual or another; or he knows

that such acts create a strong probability of death or great bodily harm to that individual or another.

* * *

It is possible in Illinois for a jury to find a defendant guilty of what is called second degree murder. Many years ago it used to be called voluntary manslaughter, but there has been some changes in what the definition is.

* * *

*** [I]f the State proves a first degree murder, but you would wish to argue to the jury, and if the Court found it was proper in this case, that at the time you performed the acts which cause the death of James Calvin Jones, also known as Joseph Moore, then that may be—or those may be factors which could reduce a first degree murder to a second degree murder.

In other words, in effect, the jury would be told that if they find that a first degree murder has been proven, but there were circumstances surrounding that first degree murder, specifically, that at the time the murder was committed, you were acting under a sudden and intense passion resulting from serious provocation by him, then those would be elements that could establish a second degree murder, and if I instructed the jury on that, then the State would have the burden of proving that beyond a reasonable doubt, that those reducing factors were not present and they would have to prove to the jury beyond a reasonable doubt that you did not act under a sudden and intense passion resulting from serious provocation. [We note that this is an incorrect statement of the law. The trial judge's correction of this misstatement is included below.]

What would be serious provocation? If your attorney argued, and I permitted the jury to be instructed, I gather the evidence would be that serious provocation could be from the defense standpoint when you tapped the decedent on the shoulder and he turned and pulled out a shank, that that could be serious provocation. It also could relate to self-defense.

[DEFENSE COUNSEL]: Your Honor, I think that the defendant, contrary to our prior discussions, has concluded

that he wishes me to tender that instruction. I don't have one available right now. I would tell the Court that I do intend now to tender such an instruction and would ask the Court to rule on whether it would be given or not now. I will tender the standard Murder II.

* * *

[THE COURT]: Mr. Ahlemeyer, because I was assuming from a conversation before defendant was brought in that perhaps he didn't want them instructed on second degree murder—

[DEFENSE COUNSEL]: I was too. I thought so, your Honor.

[THE COURT]: Let me tell you, Mr. Griffith, practically what it means to you. A second degree murder instruction telling them that they can consider that and telling them what they would have to find in order to find you guilty of second degree murder rather than a first degree murder.

Some defendants say: I don't want to let the jury compromise the verdict. I believe I have a legitimate self-defense or I'm just simply not guilty, for whatever reason, as brought out in the trial, and I want them to make a decision that I'm either guilty of murder or I'm not and I don't want to provide them with something that they may look at and could in effect compromise.

Sometimes people say the defendant is rolling the dice on all or nothing in the murder case, that either the jury is going to be forced to find a first degree murder or nothing and they don't have any in between room because if they are not instructed that they can find something less than murder, first degree murder, then it's all or nothing.

They wouldn't be able to come back and say: We don't agree on first degree murder, but we want to agree something other than that. They would not have any verdict forms for anything other than first degree murder and they couldn't do that and they are faced with choosing between first degree murder or no murder by virtue of, in this case, self-defense.

If you give them a second degree murder instruction, *** the State would have to prove beyond a reasonable doubt that there were no reducing factors, there was

nothing to kind of make it less serious murder, and that's what we are talking about. [We note that the trial judge again misstated the law. His correction is included below.]

A second degree murder is still a murder. They find somebody guilty of murder, and then after they do that, if the defendant says: Yeah, but I was under a sudden and intense passion resulting from serious provocation by whoever got killed, and if the jury gets that instruction, then the jury has to find beyond a reasonable doubt that those factors that would lessen how serious it is are not present.

So, in other words, the State has to prove a negative. They have to prove that there was no serious and intense passion resulting from serious provocation by the dead person and they have to prove that to the jury beyond a reasonable doubt. If they can't do that, then the jury, under the law would find a second degree murder. [Again, this is a misstatement of the law which is corrected below.]

So, it's a decision that only you can make and it's one where, in effect, you are saying I will roll the dice, it's all or nothing, or I would ask the Court to instruct them on what a second degree murder is knowing that they may come in with a second degree, and if you are convinced that it should be all or nothing, then that's your choice.

If you aren't convinced you want them to be told it's all or nothing, I still have arguments to hear whether it's proper to give that instruction, but that, to some people, is a compromise verdict and some defendants afterwards say: I was crazy. I found out afterwards the jury would never have found me guilty of a first degree murder and if they were faced with all or nothing, it would be [*sic*] nothing. Now look what happened. They came in with a second degree because they had that way to kind of wiggle around in it, but that's up to you.

Your lawyer can't make the decision. Only you can make the decision.

[PROSECUTOR]: Judge, I believe when you were telling him about the various burdens and the allocations of the burdens, I believe that you may have misstated or perhaps in my deafness I may have misunderstood what you said.

As I understand the burdens in a second degree, we

have the obligation of proving first degree murder and then the defense had the burden of establishing, by a preponderance of the evidence, mitigating factors ***. [At this time the trial judge researched who maintains the burden of proof regarding the mitigating factors in a second degree murder charge.]

[THE COURT]: [The relevant statute provides that] [w]hen a defendant is on trial for first degree murder and evidence of either the mitigating factors *** has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of killing that would justify or exonerate the killing ***.

Second degree murder is a Class 1 felony. The possible penalties for second degree murder would be a prison term for a period of years of anywhere from four to 15 years, or depending if the defendant is a repeat offender or it's especially heinous or brutal, then it could be an extended term of 15 to 30 years.

So, Mr. Griffith, if you would be found guilty of second degree murder, the possible sentence range would be four to 15 years in the Illinois Department of Corrections or an extended sentence of 15 to 30 years and that would carry with it a two year supervised release or parole period.

* * *

So, in other words, I told you before that in effect if I gave a second degree murder instruction, then the State would have to disprove beyond a reasonable doubt that there is serious provocation sufficient to incite an intense passion in you, a reasonable person, and they would have to disprove that *** James Calvin Jones, also known as Joseph Moore, did something to cause a sudden and intense passion ***.

In effect, I told you before the State would have to disprove that. The law is not that. The law is that you would have to show by what's called a preponderance of the evidence a mitigating factor that you would be guilty

of the lesser offense of second degree murder and the jury would have to find that it would be more probably true than not true that a mitigating factor was present and that at the time \*\*\* James Calvin Jones was killed \*\*\* you were acting under a sudden and intense passion resulting from serious provocation by him.

So, I will try and put it in layman's terms. First of all, I told you what the possible penalty is for second degree murder. Do you understand what that is?

[THE DEFENDANT]: Yes, I do.

[THE COURT]: That's prison time. There's no possibility of a death sentence \*\*\*.

\* \* \*

So if they came back with a second degree murder, you would be looking at consecutive prison time from four to 15 years or from 15 to 30; do you understand that?

[THE DEFENDANT]: Yes I do.

[THE COURT]: Now, in effect, if the jury is given instruction that they can find you guilty of second degree murder, what it means to you is that the State has to prove beyond a reasonable doubt that you committed a first degree murder, then you would have to show to the jury and the jury would have to find from the evidence in the case that it's more probably true than not true that there was what's called a mitigating factor, that the murder of James Calvin Jones, also known as Joseph Moore, occurred while you were acting under a sudden and intense passion resulting from serious provocation by him

So, what it really means is that if the jury said: Well, the State had proved that you intended to kill or do great bodily harm to James Calvin Jones or that you knew that your acts could, will cause his death or you knew that there was a strong probability of death or great bodily harm by thrusting at him with a shank, and therefore that constitutes a first degree murder, the jury then further, in looking at the evidence, if they found those elements of first degree murder proven beyond a reasonable doubt, could determine based on the evidence that if when the killing took place you were acting under a sudden and intense passion, there was serious provocation by the victim, then they could come back with a second

degree murder instead of a first. It's still murder; it's a difference in the responsibility.

Do you follow what I'm saying there?

[THE DEFENDANT]: Yes, I do.

[THE COURT]: And that would be up to you through the evidence presented in the case and in the arguments of your attorney to show them that. Okay.

And some people have argued in higher courts that it's not fair to make you prove that you are less culpable or less responsible because of the circumstances, that the burden ought to stay on the State and this statute has been upheld and it did change the law in Illinois and puts some burden on your side to show that it was—that it was a second degree murder rather than a first degree murder.

Now, I have gone through all of this, and in the meantime Mr. Ahlemeyer |defense counsel] says you have been thinking further and it's your position, and I don't know if it still is because we have talked about it for awhile, that you would like the jury only instructed as to first degree murder and not as to both first and second degree.

[THE DEFENDANT]: I think I would like the jury to consider the first degree or acquittal.

[THE COURT]: Okay. So, in other words, if we give them second degree murder instructions, that is considered kind of a compromise verdict, and the cases have talked about that, and if you go just for guilty or not guilty of first degree murder, the jury gets no information that they can in effect find you guilty of first degree, but then if they find this mitigating factor, in effect come back with second degree, that's the risk you run in deciding I don't want them instructed on second degree and that it's all or nothing.

[THE DEFENDANT]: That's right; that's what I agree.

[THE COURT]: That's a big decision for you and that's one I can't make, your lawyer can't make for you, only you can make.

[THE DEFENDANT]: I have been weighing it and thinking about it all day. I have come up with the conclusion that it's either one or the other, acquittal or a first degree.

[THE COURT]: I would indicate for the record that I believe the defendant has now been properly instructed that it would be the defendant [who] would have to show by a preponderance of the evidence it's probably more true than not true—that there would be a mitigating factor.

I have told him in this case the mitigating factor, I assume, is his testimony that the victim turned, pulled a shank on him, and although these get into cross elements of self-defense and the jury will consider a self-defense to the first degree murder, but they could consider not only self-defense, but that it was a second degree murder.

Now those may not seem real consistent that you say in one breath: I was acting in self-defense and in the other breath—which would result in a finding of not guilty if the jury found self-defense, and then in the other breath say: Well, if you don't find I was acting in self-defense, what he did in his conduct incited me and makes my responsibility somewhat less and it's a second degree murder.

You are shooting for first degree murder with the defense of self-defense which would mean a not guilty if the jury finds self-defense or they are going to find you guilty of first degree murder, and if they find you guilty of first degree murder, only two ways to go, that would be death penalty or a natural life and those are the only two alternatives if you get found guilty of a first degree murder, and if they came back with a second degree then there's no possibility of a death sentence or a natural life.

[THE DEFENDANT]: I understand, your Honor. I will take my chances.

\* \* \*

[THE COURT]: Okay. So, we will have no series of instruction advising the jury of the definition of a mitigating factor for second degree murder and we will not instruct the jury on both first degree murder and second degree murder and they will be instructed only on first degree murder and the defendant, and I believe that he has thought this through, I believe he understands and I believe he understands he's rolling the dice, It's an all or nothing proposition, and that the court, I believe, would

be willing to give both a first degree and second degree instructions, and he says: No, only give the first degree.

Mr. Ahlemeyer, are you satisfied he understands what's going on?

[DEFENSE COUNSEL]: I believe he does.

[THE COURT]: All right."

It has long been recognized that there are four decisions which belong exclusively to the criminal defendant to make after full consultation with his attorney: what plea to enter, whether to waive a jury, whether to testify on his own behalf, and whether to appeal. (*Jones v. Barnes* (1983), 463 U.S. 745, 751, 77 L. Ed. 2d 987, 993, 103 S. Ct. 3308, 3312.) These decisions cannot be denied him. Matters of trial tactics and strategy, on the other hand, belong to the lawyer. That is, not to say, however, that the converse is true. In other words, it is not error merely because the defendant himself may decide a matter of trial strategy rather than his lawyer.

In this case, the defendant was fully informed by the judge about the separate instructions of first and second degree murder. It is clear from the record that the defendant's choice was voluntary, intelligent and knowing. In telling the judge that he did not want the second degree murder instruction to be given, the defendant stated: "I have been weighing it and thinking about it all day. I have come up with the conclusion that it's either one or the other, acquittal or a first degree." With his attorney present, the defendant chose not to instruct the jury on second degree murder. In other words, he wanted the jury to have but two alternatives: guilty of murder in the first degree or not guilty. He did not want to take the chance of a compromise verdict of murder in the second degree. He would go for broke. His attorney verified that the defendant understood what he was doing. Neither the defendant's attorney nor the defendant objected to the judge's directive that the defendant and not the attorney make this decision. Neither did

the defendant's attorney indicate in any way that he was of a different opinion or that the choice was unsound.

Now, however, having taken his chances and lost, the defendant claims, in hindsight, that it was error to require him to make this decision. We do not agree.

Defendant further incorporates into this argument that his counsel was somehow ineffective for not objecting on procedural grounds that the decision belonged to counsel exclusively. While it is true that no such objection was raised, a fair reading of the colloquy at the jury instruction conference causes us to conclude that defense counsel willingly acquiesced in and accepted both the directive to the defendant and the defendant's wishes in this regard. There is no indication whatever of any difference of opinion between the defendant and his attorney as to the decision not to give the second degree murder instruction. We find no error here in the judge's directive to the defendant to make this decision. It was a tactical decision to be sure. However, it is only in hindsight that the decision could be deemed unfortunate. Had the defendant chosen to ask for a second degree murder instruction and been convicted of that, he most assuredly would now be raising a similar objection, equally invalid.

Defendant's final contention of error in regard to the jury instruction conference is that the judge gave incorrect, misleading, and coercive admonishment regarding the giving of a second degree murder instruction. Thus, defendant contends that he gave an unknowing and nonintelligent waiver of his right to have the jury instructed on second degree murder. Out of the entire jury instruction conference, which is essentially set out above, defendant takes a few isolated remarks out of context and gives them undue weight.

Defendant relies upon the following alleged errors: (1) the trial judge, although subsequently correcting himself, misstated the law regarding the burden of proof in establishing the mitigating factors for second degree murder; (2) the trial judge failed to state that a valid mitigating factor for the jury to consider in determining second degree murder is an unreasonable belief of self-defense; (3) the trial judge failed to state that the prosecution must disprove defendant's affirmative defense of self-defense; (4) the trial judge told the defendant that theories of self-defense and second degree murder are inconsistent; (5) the trial judge referred to second degree murder as a compromise instruction; (6) the trial judge failed to expressly tell the defendant that an acquittal could occur even if the second degree murder instruction was offered; and (7) the trial judge confused the defendant by telling him that while the law in regard to second degree murder required him to prove that he was less culpable, arguments have been made that placing this burden upon the defendant is unfair.

All of these claims are without merit. A review of the jury instruction conference reveals that of these alleged errors, the trial judge himself either corrected the error, or the alleged comment or omission had no impact upon the jury instruction conference when viewing the conference in its entirety.

## SENTENCING ISSUES

Defendant claims that he was denied his right to an individualized capital sentencing hearing. In support of this contention, defendant points out that he offered mitigating evidence from two prison educators, and a juvenile probation officer who had known the defendant for seven years. In essence these mitigation witnesses testified that in their dealing with the defendant they had found him to be polite, courteous, open to suggestion, and a good worker with fellow inmates. In commenting on this mitigation evidence, the trial judge stated that

there is no question that the defendant while dealing with authority figures is a likeable inmate. The judge went on to note, however, that many inmates in Illinois are likeable, including some on death row. Defendant contends that these comments indicate that the trial judge refused to consider this evidence and thought that it had no mitigating value.

Prior to the imposition of the death penalty, an individualized assessment of the circumstances of the crime and character of the defendant must be made. (*People v. Turner* (1993), 156 Ill. 2d 354, 359-61.) Merely because mitigation evidence is presented, however, does not automatically render the evidence sufficient to preclude a sentence of death. Contrary to defendant's assertions, the trial judge did not state that evidence of defendant's "likeability" had no mitigation value. At the same time, however, it is reasonable for a trial court to conclude that a defendant's good behavior in front of authority figures is not necessarily representative of his usual behavior. The trial judge properly considered defendant's mitigation evidence, for whatever it was worth, and properly concluded that it was insufficient to preclude a sentence of death.

Defendant next claims that the trial judge, in sentencing defendant to death, erroneously believed that the ultimate responsibility for imposing the death sentence rested with the reviewing State and Federal courts. This contention is totally without merit and stems from a mischaracterization of the judge's comments. In making some general comments on the death penalty and the seriousness of the decision he was making, the trial judge stated that due to the current conservative posture of both State and Federal courts, once a death sentence is imposed it is more likely than in the past that a defendant will actually be executed. The judge went on to note that this had been a terrible

and agonizing decision for him to make. By looking at this comment in context, it is apparent that the trial judge not only understood that the ultimate responsibility for imposing the death sentence rested with him, but he also believed that defendant would be unable to stop his execution by way of legal maneuvers and that defendant's life rested in his hands.

Defendant's third and final contention of error in connection with his sentencing hearing is that the trial judge, in pronouncing defendant's death sentence, relied upon information outside the record which the defendant had no opportunity to rebut or explain. As with defendant's previous argument, this argument also takes the trial judge's comments out of context. Defendant points out that at one point the trial judge remarked that if an inmate in the Illinois prison system commits a murder and is sentenced to natural life, generally that means that after serving one year of disciplinary segregation, the inmate will be released back into the general prison population. Additionally, the trial judge noted that without the death penalty there would be nothing to deter an inmate serving a life sentence from killing fellow inmates and prison officials. These comments were but one aspect of the judge's articulation of his rationale for imposition of the death sentence and were not error. In rendering a sentence, a trial judge is presumed to have relied upon only competent and reliable evidence. Additionally, it is defendant's burden to overcome this presumption. The defendant has offered no evidence, nor can we find any, that the trial judge's rhetorical comments served as an improper basis for the death sentence. The record does reveal, however, that in imposing the death sentence the trial court explained that its decision was guided by specific statutory provisions. The trial judge noted that defendant had been proven guilty of first degree murder be-

yond a reasonable doubt and was found eligible for the death sentence since he killed a prison inmate on prison grounds. In aggravation, the trial judge noted that defendant had an extensive history of violent crime, including convictions for two residential burglaries and a brutal murder by use of a hammer and knives which he committed at the age of 16. It was based upon these factors that the death sentence was imposed.

## CONSTITUTIONALITY OF THE DEATH PENALTY

Defendant finally contends that the Illinois death penalty statute is unconstitutional because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation evidence, and because it does not sufficiently minimize the risk of an arbitrary or a capricious death sentence. These arguments have been previously addressed and rejected by this court. (See *People v. Burrows* (1992), 148 Ill. 2d 196, 259-60.) Defendant fails to persuade us to reconsider this court's prior holdings.

## CONCLUSION

For the above reasons, we affirm the judgment of the circuit court. The clerk of this court is directed to enter an order setting Tuesday, September 20, 1994, as the date on which the sentence of death entered by the circuit court of Livingston County is to be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is now confined.

*Affirmed.*

JUSTICE MILLER, specially concurring:

I concur in the judgment of the court. The majority properly rejects the defendant's argument that reversible error occurred in the proceedings below when the

defendant was allowed to decide whether to request that the jury be instructed on second degree murder as an included offense of the principal charge of first degree murder.

I do not agree, however, with the implication in the majority opinion that the decision whether to tender jury instructions on an included offense is a matter of trial strategy that defense counsel alone may normally resolve. (158 Ill. 2d at 493-94.) In my view, this vital determination properly belongs to the defendant, who, in consultation with counsel, must decide whether to provide a jury with the third option of a conviction on a less serious charge. Because the defendant in the present case was allowed to make that important decision, I agree with the majority's ultimate holding that no error in this regard occurred in the proceedings below.

Deciding whether to seek the submission to the jury of instructions on an included offense is closely related to the initial decision of what plea to enter—a decision that properly belongs to the defendant. Section 4—5.2(a) of the American Bar Association Standards for Criminal Justice states:

"Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are:

(i) what plea to enter;

(ii) whether to waive jury trial; and

(iii) whether to testify in his or her own behalf." 1 ABA Standards for Criminal Justice, The Defense Function § 4—5.2(a) (2d ed. 1980).

The commentary to the ABA Standards explains the relationship between a defendant's initial plea decision and the decision whether to ask that an included offense be submitted to the jury for its consideration:

"It is also important in a jury trial for the defense lawyer to consult fully with the accused about any lesser included offenses the trial court may be willing to submit

to the jury. Indeed, because this decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses. For instance, in a murder prosecution, the defendant, rather than the defense attorney, should determine whether the court should be asked to submit to the jury the lesser included offense of manslaughter." 1 ABA Standards, § 4—5.2, Commentary, at 4—68.

Adopting the view expressed in the ABA Standards, our appellate court has concluded that the decision whether to request the submission of an included offense to the jury is one ultimately for the defendant to make, in consultation with counsel (*People v. Blommaert* (1992), 237 Ill. App. 3d 811, 817; *People v. Brocksmith* (1992), 237 Ill. App. 3d 818, 827-28, *appeal allowed* (1993), 149 Ill. 2d 653), as have courts of other States (*State v. Boeglin* (1987), 105 N.M. 247, 249, 731 P.2d 943, 945; *In re Trombly* (1993), 160 Vt. 215, 218, 627 A.2d 855, 856-57; *State v. Ambuehl* (App. 1988), 145 Wis. 2d 343, 355-56, 425 N.W.2d 649, 654; contra *Van Alstine v. State* (1993), 263 Ga. 1, 3-4, 426 S.E.2d 360, 362-63).

Given the close relationship between the initial plea decision and the decision whether to tender jury instructions on an included offense, I would not construe *Jones v. Barnes* (1983), 463 U.S. 745, 77 L. Ed. 2d 987, 103 S. Ct. 3308, cited by the majority in support of its discussion, to mean that the included-offense decision is simply a matter of trial strategy that counsel alone may determine. Notably, when *Jones* states, "It is also recognized that the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal" (*Jones*, 463 U.S. at 751, 77 L. Ed. 2d at 993, 103 S. Ct. at 3312), the Court cites section 4—5.2 of the ABA Standards as authority for that proposition. If, as the commentary to

the Standards states, the decision whether to seek the submission of a lesser offense is analogous to the decision regarding what plea to enter, and thus something that the defendant himself must ultimately determine, then *Jones* contradicts rather than supports the view suggested by the majority in the present case.

As the record demonstrates, the defendant knowingly and intelligently decided not to tender to the trial court jury instructions on the included offense of second degree murder. The defendant was not prevented from consulting with counsel on this important matter, and the defendant made his determination with full awareness of the potential consequences. The defendant had already discussed the question with counsel and, after a moment's vacillation, reaffirmed his original decision not to tender instructions on the less serious charge. We have no reason now to interfere with the defendant's decision, or to relieve him of the responsibility for his choice.

JUSTICE FREEMAN, dissenting:

I conclude that defendant did not receive effective assistance of counsel and was denied the due process of law. (U.S. Const., amends. VI, XIV.) Accordingly, I dissent.

### Jury Instruction Conference

At the close of the evidence, the trial judge held a jury instruction conference. Present were not only defense counsel and the prosecutor, but also defendant. When the conference reached the instruction that defines murder, the trial judge addressed defendant individually. The trial judge attempted to explain the difference between first degree murder and the lesser included offense of second degree murder, and the possible consequences of instructing the jury on each offense. During this lecture, the trial judge explicitly stated on four occasions that only defendant could decide

whether to have the jury instructed on second degree murder. On two of those four occasions, the trial judge further told defendant that his attorney could not decide for him.

At the close of this lecture, defendant decided not to have the jury instructed on second degree murder. He stated: "I have been weighing it and thinking about it all day. I have come up with the conclusion that it's either one or the other, acquittal or a first degree." At that point, the trial judge asked defense counsel whether he was satisfied that defendant "understands what's going on?" Defense counsel replied: "I believe that he does."

Defendant contends, *inter alia*, that he did not receive effective assistance of counsel because: (1) the trial judge prevented defense counsel from assisting defendant, and (2) defense counsel failed to provide effective assistance. I agree for both reasons.

### Trial Judge

The trial judge's "advice" to defendant—that only defendant individually and not his defense counsel could decide whether to have the jury instructed on second degree murder—was incorrect. Courts have recognized only four decisions that a criminal defendant has the ultimate authority to make, after full consultation with defense counsel: what plea to enter, whether to waive a jury, whether to testify on his or her own behalf, and whether to take an appeal. *Jones v. Barnes* (1983), 463 U.S. 745, 751, 77 L. Ed. 2d 987, 993, 103 S. Ct. 3308, 3312; *People v. Ramey* (1992), 152 Ill. 2d 41, 54.

"Beyond these four decisions, however, trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client." (*Ramey*, 152 Ill. 2d at 54.) Such decisions are binding on the client. *People v. Bowman* (1990), 138 Ill. 2d 131, 141.

Specifically, the decision whether to tender a jury

instruction on a lesser included offense is uniquely one of trial strategy. (*People v. Gilyard* (1992), 237 Ill. App. 3d 8, 23-24; *People v. Palmer* (1989), 188 Ill. App. 3d 414, 428.) Thus, I am of the opinion that the decision lies within the control of defense counsel. (*Ramey*, 152 Ill. 2d at 54; *Bowman*, 138 Ill. 2d at 141; accord 7A C.J.S. *Attorney & Client* § 208, at 355 (1980); but see, *contra*, 1 Standards for Criminal Justice 4—68 (2d ed. 1980).) Consequently, the trial judge's "advice" to defendant in the present case was erroneous.

I now address whether the trial judge's error deprived defendant of the effective assistance of counsel. The sixth and fourteenth amendments to the United States Constitution guarantee the right to effective assistance of counsel. (*People v. Vriner* (1978), 74 Ill. 2d 329, 337.) "[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington* (1984), 466 U.S. 668, 684, 80 L. Ed. 2d 674, 691, 104 S. Ct. 2052, 2063; accord *People v. Lee* (1989), 185 Ill. App. 3d 420, 424-26.

Ordinarily, to establish a claim of ineffective assistance of counsel, a defendant must prove that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) counsel's substandard representation so prejudiced defendant as to deny him a fair trial. To prove actual prejudice, a defendant must show that a reasonable probability exists that, but for counsel's unprofessional errors, the result would have been different. A " 'reasonable probability' " is a probability sufficient to undermine confidence in the outcome. *People v. Horton* (1991), 143 Ill. 2d 11, 23, quoting *Strickland v. ,Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.

However, there are some circumstances where *Strickland*'s two-part test does not apply. The most

obvious circumstance is the complete denial of counsel. A criminal trial is presumed unfair if the defendant is denied counsel at a critical stage of the trial. (*United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047.) Specifically, no showing of prejudice is required where defense counsel was prevented from assisting defendant during a critical stage of the proceedings. (*Cronic*, 466 U.S. at 659 n.25, 80 L. Ed. 2d at 668 n.25, 104 S. Ct. at 2047 n.25; see *Perry v. Leeke* (1989), 488 U.S. 272, 280, 102 L. Ed. 2d 624, 633, 109 S. Ct. 594, 600.) Whether a defendant has reached a "critical stage" of criminal proceedings depends on "a pragmatic assessment of the usefulness of counsel to the accused at the particular proceeding, and the dangers to the accused of proceeding without counsel." *Patterson v. Illinois* (1988), 487 U.S. 285, 298, 101 L. Ed. 2d 261, 276, 108 S. Ct. 2389, 2398; accord *People v. Taylor* (1965), 32 Ill. 2d 165, 169.

Applying these principles to the present case, I conclude that the trial judge denied defendant counsel at a critical stage of the trial. Initially, it is clear that a jury instruction conference is a "critical stage" of criminal proceedings. Arguably, the charge to the jury "is that part of the whole trial which probably exercises the weightiest influence upon jurors." (*Andres v. United States* (1948), 333 U.S. 740, 765, 92 L. Ed. 1055, 1070, 68 S. Ct. 880, 892 (Frankfurter, J., concurring, joined by Burton, J.).) The function of jury instructions is to guide the jury in its deliberations and to help it reach a proper verdict through the application of correct legal principles according to the law and the evidence. (*People v. Hester* (1989), 131 Ill. 2d 91, 98, citing *People v. Gambony* (1948), 402 Ill. 74, 81-82.) Especially in criminal cases with conflicting evidence, "it is highly essential" that a jury be correctly instructed so that it may properly consider the facts. (*People v. Edwards* (1945),

389 Ill. 563, 566.) "Appropriate and proper instructions to a jury are essential for a fair trial." 23A C.J.S. *Criminal Law* § 1302, at 207 (1989).

Also, it is clear from the record that the trial judge prevented defense counsel from assisting defendant at this critical stage of the trial. The trial judge did not *ask* defendant if he would like to have the jury instructed on second degree murder. Rather, the judge repeatedly told defendant that *only* he and *not* his defense counsel could decide. The trial judge explicitly stated that defense counsel could not participate in the decision, thereby forcing defendant to appear *pro se* on this issue.

The majority simply ignores the law as explained by the United States Supreme Court. The majority states that the trial judge fully informed defendant (albeit initially incorrectly) about the separate instructions for first and second degree murder. The majority concludes that defendant, with his attorney present, made the choice voluntarily, intelligently, and knowingly. 158 Ill. 2d at 493-94.

However, when a court interferes with the ability of counsel to make independent decisions about how to conduct the defense, the court denies the defendant the right to effective assistance of counsel. (*Perry*, 488 U.S. at 280, 102 L. Ed. 2d at 633, 109 S. Ct. at 599, quoting *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692, 104 S. Ct. at 2063.) "The constitutional right to be represented by counsel includes defendant's right to conference with an attorney. Such right to confer is at no time more important than during the progress of a trial." (*State v. Larmond* (Iowa 1976), 244 N.W.2d 233, 236.) I conclude that the trial judge prevented defense counsel from assisting defendant during a critical stage of the proceeding.

*Defense Counsel*

Defendant contends that he did not receive effective assistance of counsel during the jury instruction conference also because defense counsel did not provide it. A claim of ineffective assistance of counsel is not limited to counsel's performance as a whole, but, rather, may focus on specific errors and omissions. *Cronic*, 466 U.S. at 657 n.20, 80 L. Ed. 2d at 666 n.20, 104 S. Ct. at 2046 n.20.

Applying *Strickland*'s two-part test to the present case, I conclude that defendant did not receive effective assistance of counsel. Referring to the first part of the *Strickland* test, the record shows that defense counsel's conduct fell below an objective standard of reasonableness. See *Horton*, 143 Ill. 2d at 23.

The majority quotes at length from the trial judge's lecture on second degree murder. The majority acknowledges that defense counsel did not object to or indicate any disagreement with the trial judge's erroneous directive that defendant and not defense counsel make the decision. The majority also acknowledges that defense counsel did not indicate any disagreement between himself and defendant. 158 Ill. 2d at 493-94.

This is exactly the point. During the trial judge's lecture, defense counsel did not say or do anything. "That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the [sixth amendment]." *Strickland,* 466 U.S. at 685, 80 L. Ed. 2d at 692, 104 S. Ct. at 2063; accord *Lee*, 185 Ill. App. 3d at 425.

Defense counsel stood mute while the trial judge forced defendant to make a decision that was defense counsel's to make. The record also shows confusion on the part of defense counsel due to a lack of communication between him and defendant. When defendant stated that he did not want the jury instructed on second degree murder, he stood alone.

Referring to the second part of the *Strickland* test, I further conclude that, had the jury been instructed on second degree murder in addition to first degree murder, there is a reasonable probability that the result would have been different. See *Horton*, 143 Ill. 2d at 23.

Initially, defendant was clearly entitled to a jury instruction on second degree murder. The majority previously recounted the evidence adduced at trial. I need not repeat it here. Suffice it to say that the record contained evidence of whether defendant committed second degree murder, *i.e.*, whether unlawful force was threatened against defendant and that he was not the aggressor, and that he unreasonably believed that he acted in self-defense (*People v. Jerome* (1990), 206 Ill. App. 3d 428, 432; see Ill. Rev. Stat. 1989, ch. 38, pars. 7—1, 9—2(a)(2)). See *People v. Everette* (1990), 141 Ill. 2d 147, 156.

Also, the defense theory was that defendant acted in self-defense. The jury was instructed on self-defense. A defense of self-defense does not preclude a second degree murder instruction. Rather, if the evidence supports a self-defense instruction, it will also support a second degree murder instruction. (*People v. Lockett* (1980), 82 Ill. 2d 546, 550-51.) I also note that the trial judge stated that the evidence justified an instruction on second degree murder in addition to one on first degree murder. All of these reasons entitled defendant to have the jury instructed on second degree murder.

Such an instruction would have provided an important third option to the jury. If the jury believed that defendant was guilty of something, but uncertain whether first degree murder had been proved, it might have convicted defendant of the lesser offense rather than convict or acquit him of the greater offense. See *Keeble v. United States* (1973), 412 U.S. 205, 212-13, 36 L. Ed. 2d 844, 850, 93 S. Ct. 1993, 1997-98.

I am also of the opinion that had the jury been instructed on second degree murder in addition to first degree murder, there is a reasonable probability that the result would have been different. The evidence pertaining to second degree murder was closely balanced and conflicting, sufficiently so to undermine confidence in the outcome. I conclude that defendant did not receive effective assistance of counsel.

Since defendant did not receive effective assistance of counsel, he did not receive a fair trial. (*Strickland*, 466 U.S. at 684-85, 80 L. Ed. 2d at 691-92, 104 S. Ct. at 2063.) As the United States Supreme Court stated:

> "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he [may] have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. *** If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Powell v. Alabama* (1932), 287 U.S. 45, 68-69, 77 L. Ed. 158, 170-71, 53 S. Ct. 55, 64.

This is what happened in the present case. I dissent.

JUSTICES HARRISON and NICKELS join in this dissent.